UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x   Docket No.:  12-CV-2149
SHERRY GRANT,

                    Plaintiff,

              -against-

                      **AMENDED COMPLAINT**

UNITED FEDERATION OF TEACHERS, UNITED
CEREBRAL PALSY OF NEW YORK CITY, INC.,     **DEMAND FOR JURY**
EVERETT WATTS, and PATRICIA TRAYNOR,     **TRIAL**

                  Defendants.
-------------------------------------------------------------------x

       Plaintiff SHERRY GRANT, by her attorneys Precious C. Aneji, Esq. and Kathy A.

Polias, Attorney-at-Law, complaining of the Defendants UNITED FEDERATION OF

TEACHERS, UNITED CEREBRAL PALSY OF NEW YORK CITY, INC., EVERETT

WATTS, and PATRICIA TRAYNOR, upon information and belief, alleges as follows:

## NATURE OF ACTION

1.     This action is brought to remedy:

(a)    Defendant United Federation of Teachers' (hereinafter also "UFT") breach

        of its duty of fair representation, in violation of the Labor Management

        Relations Act;

(b)    Defendant United Cerebral Palsy of New York City, Inc.'s, Defendant

        Everett Watts', and Defendant Patricia Traynor's breach of the Collective

        Bargaining Agreement between UCP and UFT, of which Plaintiff is a

        beneficiary, in violation of the National Labor Relations Action and the

        Labor Management Relations Act;

(c)    Defendant United Federation of Teachers' retaliation against Plaintiff for

engaging in protected activity, in violation of the New York State Human

Rights Law; and

(d)     Defendant United Federation of Teachers' retaliation against Plaintiff for

engaging in protected activity, in violation of the New York City Human

Rights Law.

## JURISDICTION AND VENUE

2.      Jurisdiction is specifically conferred upon this Court by Labor Management

Relations Act, Section 301.  This Court has pendent and supplemental jurisdiction over

Plaintiff's state law and city law claims, as the facts that form the basis of the state and city law

claims are substantially similar to the facts that form the basis of the federal law claims.

3.      Venue is proper because the incidents complained of in this lawsuit occurred in

the Eastern District of New York and duly authorized officers or agents of the United Federation

of Teachers are engaged in representing or acting for employee members in the Eastern District

of New York.

## PARTIES

4.      During all times relevant and material to this complaint, Plaintiff Sherry Grant

was a member of the labor organization United Federation of Teachers and an employee of

United Cerebral Palsy of New York City, Inc. within the meaning of the National Labor

Relations Act and the Labor Management Relations Act.

5.      During all times relevant and material to this Complaint, Defendant United

Federation of Teachers was a "labor organization" within the meaning of the Labor Management

Relations Act and the National Labor Relations Act and maintained its principal place of

business at 52 Broadway, New York, NY 10004.

6.     During all times relevant and material to this Complaint, Defendant United Cerebral Palsy of New York, Inc. was an "employer" within the meaning of the Labor Management Relations Act and the National Labor Relations Act and maintained its principal place of business at 80 Maiden Lane, New York, NY 10038.

7.     During all times relevant and material to this Complaint, Plaintiff was the beneficiary of a Collective Bargaining Agreement between United Federation of Teachers and United Cerebral Palsy of New York City, Inc., in effect from December 30, 2009 to June 29, 2012, annexed hereto.

8.     During all times relevant and material to this Complaint, Defendant Everett Watts was an employee and agent of Defendant United Cerebral Palsy of New York City, Inc.  He was employed as a Residential Program Director at UCP's Landings site/unit and had an office at 620 Louisiana Avenue, Brooklyn, New York 11239.

9.     During all times relevant and material to this Complaint, Defendant Patricia Traynor was an employee and agent of Defendant United Cerebral Palsy of New York City, Inc.

## FACTUAL ALLEGATIONS

10.     Plaintiff Sherry Grant has been a Residential Program Specialist with Defendant United Cerebral Palsy of New York City, Inc. (hereinafter also "UCP") since 2000.  She has been a member of the labor organization, United Federation of Teachers, for several years.  She is covered by the Collective Bargaining Agreement in effect from December 30, 2009 to June 29, 2012 between United Cerebral Palsy of New York City, Inc. and United Federation of Teachers acting on behalf of Plaintiff and other employees of UCP.  A copy of the Collective Bargaining Agreement is annexed hereto.

11.     Plaintiff has had a pending lawsuit against UCP since early 2011, in which she

asserts claims against UCP of sex discrimination and retaliation for engaging in protected activity. That lawsuit is <u>Sherry Grant v. United Cerebral Palsy of New York City, Inc., et al.</u>, 11-CV-0018 and is pending in the United States District Court, Southern District of New York. Prior to bringing that lawsuit, she had made complaints against UCP to the New York State Division of Human Rights and the U.S. Equal Employment Opportunity Commission of sex discrimination and retaliation for engaging in protected activity, namely for complaining about sex discrimination. She had also complained about sex discrimination to managerial staff at UCP.

12.     In October 2011, Plaintiff was questioned by UCP about false allegations that she was heard saying that a consumer should burn to death. Upon information and belief, two of her co-workers at UCP's Landings unit/site in Brooklyn were also the target of false allegations concerning the same consumer. However, UCP treated Plaintiff much differently than the other two employees against whom allegations were made. UCP allowed the two other co-workers to work while the investigation into the allegations against them was pending but sent Plaintiff home to wait for the outcome of the investigation.

13.     Later in October 2011, UCP informed Plaintiff that the allegations against her had been determined to be unfounded, but instead of allowing Plaintiff to return to work at the Landings unit/site, UCP arbitrarily and capriciously transferred her to another site on or about November 2, 2011 -- the E. 51st Street site in Brooklyn -- where she was scheduled for ten hours less, and therefore paid less, than at the Landings site. Everett Watts, the Residential Program Director at the Landings site, was involved in making this transfer. The two co-workers whom upon information and belief had also been the target of allegations concerning the same consumer were not transferred from the Landings site and did not sustain a reduction in hours

and wages like Plaintiff did.  The arbitrariness and capriciousness of Defendants UCP's and
Everett Watts' adverse transfer of Plaintiff stemmed from their efforts to further retaliate against
Plaintiff for complaining about sex discrimination and for complaining about retaliation.
Defendants UCP and Everett Watts breached several provisions of the Collective Bargaining
Agreement by making this transfer of Plaintiff.  By reducing Plaintiff's hours from the number of
hours she worked at the Landings site even though there was not a lack of work and even though
less senior employees' hours were not reduced, Defendants UCP and Everett Watts violated
Section A(1) of Article 25 (Hours of Work) of the Collective Bargaining Agreement.
Defendants UCP and Everett Watts breached Section D of Article 27 (Vacancies, Transfers,
Promotions, Layoffs, and Recalls) of the Collective Bargaining Agreement by arbitrarily and
capriciously transferring Plaintiff from the Landings site to the E. 51st St. site, without any basis
for disciplining Plaintiff, against Plaintiff's will, without Plaintiff's consent, and ahead of less
senior employees.  Defendants UCP and Everett Watts breached Section B of Article 28 (Due
Process) of the Collective Bargaining Agreement by transferring Plaintiff from the Landings site
to the E. 51st Street site without just cause, against her will, and without her consent.

14.    On or about November 3, 2011, Plaintiff asked Defendant United Federation of
Teachers to file a grievance on her behalf regarding the transfer.  Defendant UFT was aware that
the allegations made against Plaintiff had been determined to be unfounded, that UCP had no just
cause for transferring Plaintiff, that Plaintiff was transferred ahead of less senior employees, that
the transfer resulted in a reduction in her wages, that Plaintiff was transferred against her will
and without her consent, and that UCP breached the Collective Bargaining Agreement by
transferring Plaintiff.  Yet, despite all of this, UFT indicated an unwillingness to file a grievance.
Given the circumstances, the union's decision was so far outside a wide range of reasonableness

that it was irrational.

15.     Plaintiff was summoned to a meeting to take place on or about November 16,

2011 with UFT and UCP.  Plaintiff's UFT Chapter Leader told her prior to the meeting that the

meeting was to confirm her schedule at the E. 51st Street site and to give her back the hours she

had lost.  When Plaintiff arrived at the meeting, she found Defendants Everett Watts and Patricia

Traynor acting on behalf of UCP, her UFT Chapter leader, and UFT employee Olivia Wint.  Ms.

Wint told Plaintiff that UCP had asked her to intervene.  UCP apparently wanted a union

representative present who would be more amenable to it and who would comply with its wishes

and goals and UFT granted UCP's request by having Ms. Wint attend the meeting.  UFT acted in

a way that was against Plaintiff's interests.  Ms. Wint was there to take over the "representation"

of Plaintiff, although she failed to represent Plaintiff.  Ms. Wint told Plaintiff that UCP wanted to

transfer her again to a different site/unit/assignment and that Plaintiff had to take one of the two

transfer options that UCP was offering or stay home without pay.  Plaintiff was told that she had

to decide right there and then whether to take one of the transfer options.  Defendant Patricia

Traynor made the baseless allegation that the consumers at the E. 51st Street site did not like her.

Both transfer options would have inflicted undue hardship on Plaintiff and were adverse to

Plaintiff.  One transfer option was to Staten Island, which was far away from Plaintiff's home.

The other transfer option was to another site in Brooklyn, where the schedule would inflict undue

hardship on Plaintiff who had a young baby.  Ms. Wint did not even try to defend Plaintiff's

interests at the meeting or try to stop yet another transfer.  Ms. Wint knew that UCP was

blatantly violating the Collective Bargaining Agreement.  Ms. Wint defended UCP at the

meeting, instead of defending Plaintiff as Ms. Wint was required to do.  Ms. Wint's actions were

arbitrary, discriminatory, and in bad faith.

16.     By attempting to again transfer Plaintiff, Defendant UCP breached the same provisions of the Collective Bargaining Agreement as it had breached when it had transferred Plaintiff from the Landings site to the E. 51st Street site.

17.     After the meeting, Plaintiff repeatedly contacted UFT about what occurred at the meeting.  UFT indicated an unwillingness to grieve UCP's efforts to again transfer Plaintiff. UFT continued to represent to Plaintiff that her only alternative was to take one of the two transfer options, both of which would have inflicted undue hardship on her and been adverse to her.  UFT was aware that UCP was violating the Collective Bargaining Agreement and that UCP had a motive to retaliate against Plaintiff.  UFT capriciously sided with UCP and failed to represent Plaintiff.  UFT acted arbitrarily, discriminatorily, and in bad faith, and actually participated in and facilitated UCP's retaliation toward Plaintiff for her protected activity.

18.     Plaintiff was called for a Step One meeting in early April 2012 on a grievance purportedly filed by UFT in the middle of December 2011.  However, upon information and belief, UFT failed to make reasonable efforts to expeditiously schedule a Step One meeting on the grievance under the circumstances and failed to effectively and fairly prosecute the grievance.  UFT did not schedule a Step One meeting until early April 2012, which was almost four months after the grievance was purportedly filed.  Furthermore, by time of the Step One meeting, Plaintiff had already been home without pay for almost five months.  A space of almost four months between the purported submission of a grievance in the middle of December 2011 and a Step One meeting in the beginning of April 2012 was a grossly unreasonable delay. Furthermore, under the Collective Bargaining Agreement, the union was to file the grievance within ten days after the facts giving rise to the grievance were known or reasonably known to Plaintiff.  Even if the union filed the grievance in December 2011, that was more than a month

after Plaintiff contacted the union about filing a grievance and the facts giving rise to the grievance were known to Plaintiff.

19.     Even if the union filed a grievance regarding Plaintiff, the manner in which it has prosecuted the grievance has shown that the union does not intend to effectively and fairly represent Plaintiff on the grievance. Its behavior has been arbitrary, discriminatory, and in bad faith. In addition to the foregoing, the following has occurred. At the Step One meeting which Olivia Wint again attended with Plaintiff's UFT Chapter Leader, the substance of the purported grievance and the ways in which UCP violated the Collective Bargaining Agreement were not even discussed. Plaintiff was offered a few options for placement, all for fewer hours than she had worked at the Landings. In an effort to mitigate her damages, Plaintiff tried to accept one of the placements. UFT presented her with an agreement among Plaintiff, the union, and UCP that among other things, contained statements aimed at protecting the union from any liability. The union represented that if Plaintiff wanted the placement, she had to sign the agreement. The union made sure that self-serving statements were in a contract with the employer, in which the union was supposed to be serving Plaintiff's interests.

20.     In addition, Plaintiff discovered on May 30, 2012 during a deposition of Alan Seiler, the former Director of Human Resources at UCP, that the union did not require or mandate that Mr. Seiler, who was UCP's designee at Step Two of the grievance procedure to put his reasons for denying a grievance in writing to the union. Mr. Seiler testified that he only orally gave his reasons for denying a grievance at the Step Two hearing, that he did not put his reasons in writing, and that the union did not complain to him about his failure to put the reasons in writing, even though Section C(1) of Article 29 (Grievance and Arbitration Procedure) states with regard to Step Two: "The answer of the Executive Director or designee shall be given in

writing to the Union within ten days after the meeting and shall set forth the reason if the grievance is denied." Mr. Seiler had denied grievances filed by the union on behalf of Plaintiff. The union's failure to mandate that Mr. Seiler put his reasons in writing and to thereby enforce the Collective Bargaining Agreement would have negatively affected Plaintiff because it would have prevented the union from being able to properly evaluate whether to take Plaintiff's grievances to arbitration, and the union has in fact refused to take grievances concerning Plaintiff to arbitration after negative decisions by Mr. Seiler at Step Two that he did not explain in writing. The union's failure to mandate that Mr. Seiler put his reasons in writing also allowed Mr. Seiler and UCP in general to act with little accountability and prejudiced Plaintiff in the grievance procedure.

## AS FOR A FIRST CAUSE OF ACTION

21.     Plaintiff repeats and realleges paragraphs 1 through 20 as if each paragraph is repeated verbatim herein.

22.     In violation of the National Labor Relations Act and the Labor Management Relations Act, Defendants United Federation of Teachers has breached its duty to Plaintiff of fair representation by acting in a manner toward Plaintiff that has been arbitrary, discriminatory, and in bad faith.

## AND AS FOR A SECOND CAUSE OF ACTION

23.     Plaintiff repeats and realleges paragraphs 1 through 22 as if each paragraph is repeated verbatim herein.

24.     In violation of Section 301 of the Labor Management Relations Act, Defendants United Cerebral Palsy and Everett Watts breached Section A(1) of Article 25 (Hours of Work) of the Collective Bargaining Agreement between UFT and UCP by reducing Plaintiff's hours from

the number of hours she worked at the Landings even though there has not been a lack of work and even though less senior employees' hours have not been reduced.

## AND AS FOR A THIRD CAUSE OF ACTION

25.     Plaintiff repeats and realleges paragraphs 1 through 24 as if each paragraph is repeated verbatim herein.

26.     In violation of Section 301 of the Labor Management Relations Act, Defendants United Cerebral Palsy and Everett Watts breached Section D of Article 27 (Vacancies, Transfers, Promotions, Layoffs, and Recalls) of the Collective Bargaining Agreement between UFT and UCP by: (a) arbitrarily and capriciously transferring Plaintiff from the Landings site to the E. 51st Street site; (b) without any basis for disciplining Plaintiff, transferring her from the Landings site to the E. 51st Street site, against her will, without her consent, and ahead of less senior employees; and (c) not informing Plaintiff of the reason for the transfer from the Landings site to the E. 51st Street site.

## AND AS FOR A FOURTH CAUSE OF ACTION

27.     Plaintiff repeats and realleges paragraphs 1 through 26 as if each paragraph is repeated verbatim herein.

28.     In violation of Section 301 of the Labor Management Relations Act, Defendants United Cerebral Palsy, Everett Watts, and Patricia Traynor breached Section D of Article 27 (Vacancies, Transfers, Promotions, Layoffs, and Recalls) of the Collective Bargaining Agreement between UFT and UCP by: (a) arbitrarily and capriciously trying to transfer Plaintiff from the E. 51st Street site to yet another site; and (b) without any basis for disciplining Plaintiff, trying to transfer her from the E. 51st Street site to yet another site, against her will, without her consent, and ahead of less senior employees.

## AND AS FOR A FIFTH CAUSE OF ACTION

29.     Plaintiff repeats and realleges paragraphs 1 through 28 as if each paragraph is repeated verbatim herein.

30.     In violation of Section 301 of the Labor Management Relations Act, Defendants United Cerebral Palsy and Everett Watts breached Section B of Article 28 (Due Process) of the Collective Bargaining Agreement between UFT and UCP by taking the following adverse actions against Plaintiff without just cause:  transferring her from the Landings site to the E. 51st Street site against her will and without her consent; and reducing her hours from the number of hours she was working at the Landings site.

## AND AS FOR A SIXTH CAUSE OF ACTION

31.     Plaintiff repeats and realleges paragraphs 1 through 30 as if each paragraph is repeated verbatim herein.

32.     In violation of Section 301 of the Labor Management Relations Act, Defendants United Cerebral Palsy, Everett Watts, and Patricia Traynor breached Section B of Article 28 (Due Process) of the Collective Bargaining Agreement between UFT and UCP by after Plaintiff was at the E. 51st Street site for a short time, mandating that she stay home without pay or take one of two other assignments, both of which would cause undue hardship to her and be adverse to her.

## AND AS FOR A SEVENTH CAUSE OF ACTION

33.     Plaintiff repeats and realleges paragraphs 1 through 32 as if each paragraph is repeated verbatim herein.

34.     In violation of New York State Executive Law, Section 296 (New York State Human Rights Law), Defendant UFT retaliated against Plaintiff for her complaints against UCP

of retaliation and sex discrimination.

<b><u>AND AS FOR AN EIGHTH CAUSE OF ACTION</u></b>

35.     Plaintiff repeats and realleges paragraphs 1 through 34 as if each paragraph is repeated verbatim herein.

36.     In violation of New York City Administrative Code, Section 8, et seq., (New York City Human Rights Law), Defendant UFT retaliated against Plaintiff for her complaints against UCP of retaliation and sex discrimination.

**WHEREFORE, Plaintiff prays the court for judgment as follows:**

**Under the Labor Management Relations Act against Defendant United Federation of Teachers for the First Cause of Action:**

i.      awarding Plaintiff back pay, front pay, and lost benefits (including retirement benefits) in an amount to be proven at trial and in accordance with proof;

ii.     awarding Plaintiff compensatory damages for emotional distress, pain and suffering, humiliation, loss of dignity and livelihood in an amount to be proven at trial and in accordance with proof;

iii.    awarding Plaintiff punitive damages in an amount to be proven at trial and in accordance with proof;

iv.     awarding Plaintiff reasonable attorney's fees, reasonable expert fees, and the costs and disbursements of this action; and

v.      awarding such further relief that Plaintiff may be shown entitled to and in accordance with proof.

**Under the National Labor Relations Act and the Labor Management Relations Act against**

**Defendants United Cerebral Palsy of New York City, Inc. and Everett Watts, jointly and severally for each of the Second, Third, and Fifth Causes of Action:**

    i.     reinstating Plaintiff to her work at United Cerebral Palsy;

    ii.    awarding Plaintiff back pay, front pay, and lost benefits (including retirement benefits) in an amount to be proven at trial and in accordance with proof;

    iii.   awarding Plaintiff compensatory damages for emotional distress, pain and suffering, humiliation, loss of dignity and livelihood in an amount to be proven at trial and in accordance with proof;

    iv.   awarding Plaintiff punitive damages in an amount to be proven at trial and in accordance with proof;

    v.    awarding Plaintiff reasonable attorney's fees, reasonable expert fees, and the costs and disbursements of this action; and

    vi.   awarding such further relief that Plaintiff may be shown entitled to and in accordance with proof.

**Under the National Labor Relations Act and the Labor Management Relations Act against Defendants United Cerebral Palsy of New York City, Inc., Everett Watts, and Patricia Traynor, jointly and severally, for each of the Fourth and Sixth Causes of Action:**

    i.     reinstating Plaintiff to her work at United Cerebral Palsy;

    ii.    awarding Plaintiff back pay, front pay, and lost benefits (including retirement benefits) in an amount to be proven at trial and in accordance with proof;

    iii.   awarding Plaintiff compensatory damages for emotional distress, pain and suffering, humiliation, loss of dignity and livelihood in an amount to be proven at trial and in accordance with proof;

    iv.    awarding Plaintiff punitive damages in an amount to be proven at trial and in accordance with proof;

    v.    awarding Plaintiff reasonable attorney's fees, reasonable expert fees, and the costs and disbursements of this action; and

    vi.    awarding such further relief that Plaintiff may be shown entitled to and in accordance with proof.

**Under the New York State Executive Law, Sections 290-297 (New York State Human Rights Law) against Defendant United Federation of Teachers for the Seventh Cause of Action:**

    i.    awarding Plaintiff back pay, front pay, and lost benefits (including retirement benefits) in an amount to be proven at trial and in accordance with proof;

    ii.    awarding Plaintiff compensatory damages for emotional distress, pain and suffering, humiliation, loss of dignity and livelihood in an amount to be proven at trial and in accordance with proof;

    iii.    awarding Plaintiff punitive damages in an amount to be proven at trial and in accordance with proof;

    iv.    awarding Plaintiff reasonable expert fees and the costs and disbursements of this action; and

    v.    awarding such further relief that Plaintiff may be show entitled to and in accordance with proof.

**Under the New York City Administrative Code, Section 8, et seq. (New York City Human Rights Law) against Defendant United Federation of Teachers for the Eighth Cause of Action:**

14

i.       awarding Plaintiff back pay, front pay, and lost benefits (including retirement benefits) in an amount to be proven at trial and in accordance with proof;

ii.      awarding Plaintiff compensatory damages for emotional distress, pain and suffering, humiliation, loss of dignity, and livelihood in an amount to be proven at trial and in accordance with proof;

iii.     awarding Plaintiff punitive damages in an amount to be proven at trial and in accordance with proof;

iv.     awarding Plaintiff reasonable attorney's fees, reasonable expert fees, and the costs and disbursements of this action; and

v.      awarding such further relief that Plaintiff may be shown entitled to and in accordance with proof.

Dated: Brooklyn, New York
July 27, 2012

By: _____

Precious C. Aneji, Esq.
767 Franklin Avenue
Brooklyn, NY 11238
Tel. No.:  917-376-3018

Kathy A. Polias
Attorney-at-Law
155 Water Street
Brooklyn, NY 11201
Tel. No.:  718-514-2062

UCP000162

Table of Contents

Page

| | | |
|---|---|---|
| Article 1 | Recognition | 1 |
| Article 2 | No Discrimination | 1 |
| Article 3 | Effective Date and Duration | 1 |
| Article 4 | Probationary Period | 1 |
| Article 5 | Seniority | 2 |
| Article 6 | Union Security | 3 |
| | A.  Union Shop | 3 |
| | B.  Payroll Deduction of Union Dues | 4 |
| | C.  Employer Held Harmless | 4 |
| | D.  Union Rights | 4 |
| | E.  New Unit Employee | 5 |
| | F.  Notification of Change of Status | 5 |
| Article 7 | Rates of Pay, Minimums, and Health Care Supplements | 5 |
| | A.  Rates of Pay | 5 |
| | B.  Health Care Supplements | 6 |
| | C.  Re-opener | 7 |
| Article 8 | Pension Plan | 7 |
| Article 9 | Health and Dental Benefits | 8 |
| Article 10 | Vacations | 8 |
| Article 11 | Holiday Leave | 9 |
| Article 12 | Request to Use Accrued Holiday Leave or Vacation | 10 |
| Article 13 | Personal Days | 11 |
| Article 14 | Sick Leave | 11 |
| Article 15 | Leaves of Absence | 12 |
| | A.  Bereavement Leave | 12 |
| | B.  Jury Duty | 12 |
| | C.  Military Leave | 13 |
| | D.  Short-Term Disability Leave | 13 |
| | E.  Family and Medical Leave | 13 |
| | F.  Workers Compensation | 13 |
| | G.  Leave Without Pay | 13 |
| Article 16 | Voluntary Benefits | 15 |
| Article 17 | Tuition Assistance | 15 |
| Article 18 | Employee Referral Program | 15 |
| Article 19 | Administration of Medication | 15 |
| Article 20 | Driving of Agency Vans | 16 |
| Article 21 | Fingerprinting and Employee ID Cards | 16 |
| Article 22 | Employee Expenses and Reimbursement | 16 |

UCP000163

|  |  | Page |
|---|---|---|
| Article 23 | Training of Employees | 16 |
| Article 24 | Past Practices | 17 |
| Article 25 | Hours of Work | 17 |
|  | A.  Regular Work Day and Work Week | 17 |
|  | B.  Timekeeping | 17 |
|  | C.  Overtime | 18 |
|  | D.  Training and Staff Meetings | 18 |
| Article 26 | Overnight Trips | 18 |
| Article 27 | Vacancies, Transfers, Promotions, Layoffs | |
|  | And Recalls | 18 |
|  | A.  Posting Vacancies | 18 |
|  | B.  Voluntary Transfers and Promotions | 19 |
|  | C.  Layoffs and Recalls | 19 |
|  | D.  Transfers Within the Unit | 20 |
|  | E.  Transfers Out of the Unit | 20 |
|  | F.  Disputes | 20 |
| Article 28 | Due Process | 20 |
|  | A.  Disciplinary Interviews | 20 |
|  | B.  Discipline and Discharge | 21 |
|  | C.  Employee Investigations | 21 |
| Article 29 | Grievance and Arbitration Procedure | 21 |
|  | A.  Definition | 21 |
|  | B.  Informal Resolution | 21 |
|  | C.  Formal Grievance Procedures | 21 |
|  | D.  Arbitration | 22 |
|  | E.  Time Limits | 23 |
| Article 30 | Personnel Files | 23 |
| Article 31 | Confidentiality | 24 |
| Article 32 | Health and Safety | 24 |
| Article 33 | Separation from Employment | 24 |
| Article 34 | Severability | 25 |
| Article 35 | No Strike-No Lockout | 25 |
| Article 36 | Management's Rights | 26 |
| Article 37 | Cooperation Between the Parties | 27 |
| Exhibit A | Payroll Deduction Authorization | 28 |
| Appendix A | Minimums | |
| Appendix B | Fact Sheet on Employee Investigations | |

1UCP000164

### UCP-UFT Collective Bargaining Agreement-- Residences

Agreement made and entered into the 26th day of May 2010 by and between United Cerebral Palsy of New York City (herein "Employer") and United Federation of Teachers, NYSUT, AFT, AFL-CIO (herein "Union") acting on behalf of certain Employees of the Employer as hereinafter defined.

### Article 1
### Recognition

The Employer recognizes the Union as the exclusive collective bargaining representative of Employees certified in the following appropriate unit:

All full-time and regular part-time Senior Residential Program Specialists, Residential Program Specialists, Residence Program Specialists II, Cooks, Licensed Practical Nurses, Administrative Assistants, Physical Therapist Assistants, excluding all other employees including Managerial Employees, Confidential Employees, Supervisors and Guards, as defined in the Act.

Whenever the word "Employee" is used in this Agreement, it shall be deemed to mean the employees in the unit covered by this Agreement.

### Article 2
### No Discrimination

Neither the Union nor the Employer will discriminate against any Employee because of race, religion, sex, age, marital status, national origin, sexual orientation, color, citizenship status, union activity or non-activity, or disability unrelated to job performance.

### Article 3
### Effective Date and Duration

This Agreement will be effective from December 30, 2009 and will remain effective through June 29, 2012.

### Article 4
### Probationary Period

1. Duration. Except as set forth in section 2, a new Employee, whether or not formerly an Employee of the Employer, or an employee transferred into the bargaining unit from a different job title, or a bargaining unit Employee

UCP000165
2

voluntarily transferred to a different job title, will be on probation until the Employee has actually worked for six months in the new position or a pro-rata, i.e. extended equivalent for other than regular full-time Employees, excluding time for illness or any other non-work time.

2. Exceptions.
   (a) An AMAP certified on call Employee who has worked for more than two years and transfers into a salaried position shall serve a three (3) month probationary period upon transfer. On-call Employees who are not AMAP certified at the time of transfer into a salaried position shall serve a probationary period of six months.
   (b) Salaried Residential Employees who have completed a six (6) month probationary period prior to voluntarily returning to on-call status shall not serve a new probationary period.
   (c) Salaried Residential Employees who have completed a six (6) month probationary period prior to being returned to on-call status as a result of   not attaining a driver's license or AMAP certification shall serve a three (3) month probationary period.
   (d) Residence Program Specialists II who have completed a six (6) month probationary period and are promoted into the Residential Program Specialist title shall serve a three (3) month probationary period.

3. Extension. By written agreement between the Union and the Employer, the applicable probationary period may be extended. Failure to extend the probationary period or to terminate the Employee during or at the end of such period means the Employee has successfully completed that period.

4. Rights. During or at the end of the probationary period the Employer may discharge or discipline a probationary Employee and such discharge or discipline shall not be subject to grievance or arbitration, but the Employee is otherwise covered by the provisions of the Agreement.

## Article 5
## Seniority

1. Seniority is defined as the length of time an Employee has been continuously employed on a full time basis by the Employer including all positions outside of the bargaining unit. Part time Employees accrue pro-rata seniority. On-call Employees do not accrue seniority.

2. An Employee's seniority shall commence on the date of his/her last hire, and shall accrue during his/her continuous employment with the Employer.

3. An Employee shall neither accrue nor lose seniority while he/she is on layoff or an unpaid leave of absence or any absences while he/she is not being paid by the Employer.

4. An Employee shall lose seniority, and seniority shall be broken if the Employee
   a.  Voluntarily resigns; or
   b.  is discharged; or

3UCP000166

    c.   fails to report to work after a layoff within fourteen (14) calendar days after recall sent certified mail by the Employer to the Employee at his/her address of record on file with the Employer, except where verifiable serious illness or other provable reason acceptable to the Employer makes it impossible for the Employee to return on time and provided the Employee notified the Employer of the reason within three (3) days after recall; or

    d.   fails to report to work at the expiration of a leave of absence pursuant to this Agreement, except where verifiable serious illness or other provable reason acceptable to the Employer makes it impossible for the Employee to return on time and provided the Employee notifies the Employer of the reason within three (3) days prior to expiration of the leave of absence; or

    e.   fails to apply for re-employment within the statutory period after separation from military service; or

    f.   is laid off for twelve (12) months.

5.   An Employee whose seniority is lost for any of the reasons outlined in Paragraph 4 above shall be considered as a new Employee if he/she is again employed by the Employer. The failure of the Employer to re-hire said Employee after the loss of seniority shall not be subject to the grievance and arbitration provisions of this Agreement.

6.   Upon written request by the Union, the Employer will provide an updated seniority list to the Union every six (6) months.

### Article 6
### Union Security

**A. Union Shop**

1.   It shall be a condition of employment that every Employee who is a member of the Union in good standing as of the date of execution of this Agreement shall remain a member in good standing. Those Employees who are not members of the Union on the date of execution of this Agreement shall become and remain members in good standing of the Union no later than thirty days following the date of execution of this Agreement as a condition of employment.

2.   After the date of execution of this Agreement, every newly hired Employee will become a member of the Union within thirty days after the date of employment and thereafter will remain a member in good standing as a condition of employment.

3.   Whenever the Union charges that any Employee who is required by the provisions of this Article to become or remain a member of the Union in good standing has failed to do so, and the Union requests the discharge of such Employee, the Employer shall be so informed by the Union by certified or registered mail. The Employer shall have fourteen Days following the receipt of such notice, pursuant to the request of the Union, to discharge the Employee. If during the fourteen day period the Employee shall pay his or her delinquent dues, or the Union shall withdraw its request for termination, the Employer shall not be required to

UCP000167

discharge such Employee assuming the Employer has been so informed by the Union, by certified or registered mail.

4. "Good Standing" for the purpose of this Agreement shall mean the payment or tender of periodic dues, uniformly required as a condition of membership, to the Union.

## B. Payroll Deduction of Union Dues

1. An Employee who desires to become a member of the Union may execute a written authorization in the form annexed hereto as Exhibit A. Upon receipt of such authorization from an Employee the Employer will, pursuant to such authorization, deduct from the wages due the Employee in each pay period the regular dues fixed by the Union. However, the first deduction shall not be required to be made earlier than the first pay period following completion of the Employee's first thirty days of employment but will include the first thirty days of employment if authorized by the Employee.

2. The Employer shall be relieved from making such "check-off" deductions upon: (a) termination of employment, (b) transfer to a title outside the bargaining units, (c) layoff from work, (d) agreed leave of absence, or (e) revocation of the check-off authorization in accordance with its terms or with applicable law. Notwithstanding the foregoing, upon the return of an Employee to work from any of the above-mentioned absences, the Employer will immediately resume the obligation of making such deduction, except that deduction for terminated Employees shall require a new dues authorization form.

3. By the twentieth of each month, the Employer shall remit to the Union all deductions for dues made from the salary of Employees for the preceding month, together with lists (transmitted electronically) of all unionized Employees and Employees for whom dues have been deducted, including their social security numbers and the amount of dues deducted from each Employee's earnings.

## C. Employer Held Harmless

The Union agrees that it will hold the Employer completely free and harmless and fully indemnify the Employer from any claims, actions, damages, suits or costs of any type, attorney's fees, or proceedings related in any way to deduction, terminations or other actions pursuant to this Article.

## D. Union Rights

1. The Employer shall provide a bulletin board at each site where bargaining unit members are employed for the posting of official union business and communications. When such notices are posted, a copy shall be given to the Employer. No posted notice shall contain criticism or be of a derogatory nature with respect to the programs, policies, or personnel of the Employer, or be detrimental to the consumers. The Employer will make reasonable efforts to locate bulletin boards in an area accessible to all Employees.

2. The Union may utilize the Employer's internal mailboxes to disseminate official Union information and correspondence to bargaining unit Employees.

5UCP000168

3. The Union may request the use of available space for staff meetings on a periodic basis. It is understood that use of this space will not interfere with normal program operations and will take place on the Employee's non-work hours. Permission to use such meeting space will not be unreasonably withheld.

4. The Employer shall permit the Chapter Leader of his/her designee to take time off without pay to attend monthly meetings of the citywide UFT Delegate Assembly. The Chapter Leader shall submit to the Director of the Program a copy of the monthly dates of the citywide UFT Delegate Assembly in September. If a change occurs in the meeting dates, the Chapter Leader will advise the Director as soon as possible.

5. A Union designated committee of no more than eight (8) people shall meet with representatives from Management three times per year to discuss matters of mutual concern. Additional meetings may be agreed upon in writing between the parties. The meeting shall begin at 4 pm and end by 5:30 pm. It is understood that these meetings will not interfere with normal program operations and that Employees will not be paid for their attendance. These meetings shall in no way be deemed negotiating sessions and no side agreements or other modifications of this Agreement shall result. The agenda items will be exchanged between the Union and the Employer four (4) days in advance of the meeting date.

6. A Union Representative who is not an Employee, who wishes to visit the workplace in the conduct of official Union business, or to attend a grievance hearing shall make a request to the Director of the Program or the Director of Human Resources, by stating the date and time of the visit. This request shall be made with two (2) days' notice unless an emergency situation arises. Permission for such visits will not be unreasonably withheld.

## E. New Unit Employee

The Employer will notify the Union in writing of each new bargaining unit Employee within ten (10) working days after the Employee's employment.

## F. Notification of Change of Status

The Employer will notify on a monthly basis, in writing, the Union at the end of each month of all bargaining unit employees who have resigned or been terminated.

## Article 7
## Rates of Pay, Minimums, and Health Care Supplements

## A. Rates of Pay

1. During the term of this Agreement each Employee (including Employees on leave who return to work at or before expiration of leave) shall receive the salary increases corresponding to his or her job title category (a) or (e) below.

2. The minimum job rates of each bargaining unit title are increased in the same manner and set forth in Appendix A.

6 UCP000169

3.  Employees entitled to retroactive money shall receive payment in one separate check on June 4, 2010.
4.  The minimum job rates and salary increases in effect for bargaining unit members shall not be less than those in effect for non-bargaining unit members in the same or comparable job titles.

### Category (a)

Residential Program Specialists, Senior Residential Program Specialists, Residence Program Specialists II, Cooks, and the following Employees funded through OMRDD sources-- Administrative Assistants, Licensed Practical Nurses, Physical Therapy Assistants.

| Incumbent Salary Increase Effective Date | Payment Date | Salary Increase |
|---|---|---|
| 11/30/09 | 6/4/10 | 3% |

The above-mentioned salary increase shall be applied to all regular, additional, holiday, and overtime hours worked by category (a) employees retroactive to 11/30/09.

### Category (e)

Residential Program Specialist On-Calls

| Incumbent Salary Increase Effective Date | Payment Date | Salary Increase |
|---|---|---|
| 5/10/10 | 6/4/10 | 3% |

## B. Health Care Supplements

1.  In addition to the salary increases provided in Section A above, full time and part time category (a) Employees hired prior to 4/1/10 (including Employees on leave who return to work) shall receive the applicable health care supplements specified below.

7 UCP000170

Category (a) Employees

| Payment Date | Payment Amount | Payment Type |
|---|---|---|
| 4/1/10 | $1,000 | health reimbursement account |

2. The health care supplements for bargaining unit Employees shall not be less than the health care supplements for non-bargaining unit Employees in the same or comparable job titles.
3. The Employer shall apply for the OMRDD Health Care Initiative in each year in which it is available.

C. Re-Opener

On or before April 1, 2011 either party may give written notice of its intent to re-open Article 7 (Wages, Minimums, and Health Supplements). If such notice is timely given, the parties shall meet to negotiate in good faith the terms of Article 7, including but not limited to the use of unexpended funds that may exist as of June 30, 2011 and anticipated revenues and expenditures for the fiscal year commencing July 1, 2011. The parties agree that the resulting wages, minimums, and health supplements for bargaining unit members shall not be less than those in effect for non-bargaining unit members in the same or comparable job titles.

## Article 8
## Pension Plan

1. The Employer shall continue to provide pension benefits to Employees covered by this Agreement.

2. The pension benefits for bargaining unit Employees shall not be less than those in effect for non-bargaining unit Employees in the same or comparable job titles.

3. The Employer shall notify the Union no later than three months prior to any possible change in pension benefits for bargaining unit members.

4. A joint UCP/UFT committee will begin meeting no later than three months prior to any possible change in pension benefits for the purpose of exploring and identifying future options regarding such benefits for bargaining unit Employees.

5. The Employer, the Union, and the Employees shall comply with the Employee Retirement Income Security Act (ERISA) and other laws as applicable.

$_8$UCP000171

## Article 9
## Health and Dental Benefits

1. The Employer shall continue to provide health and dental benefits to the Employees covered by this Agreement. The health benefits for bargaining unit members during the plan year May 1, 2010 through April 30, 2011 are set forth in the Stipulation of Agreement between the parties dated April 13, 2010 and shall be incorporated into the collective bargaining agreement.

2. The health and dental benefits in effect for bargaining unit members shall not be less than those in effect for non-bargaining unit Employees in the same or comparable job titles.

3. The Employer shall notify the Union no later than two months prior to any possible change in health or dental benefits for bargaining unit members.

4. A joint UCP/UFT committee will begin meeting no later than two months prior to any possible change in health or dental benefits for the purpose of exploring and identifying future options regarding such benefits for bargaining unit members. A minimum of two alternative options will be explored.

5. The parties will negotiate in good faith in an effort to reach agreement no later than April 15th during the term of the collective bargaining agreements regarding any changes to existing health or dental benefits for bargaining unit members.

6. In the event that the premium of any existing or new health insurance plan increases effective April 1, 2010, the Employer will absorb a premium increase of up to 3%.

7. The Union shall be offered the option of (a) renewing the plan, if available, no later than April 15th of each contract year; or (b) choosing one of the alternative plans presented, with Employees paying the premium increase above 3% in either (a) or (b).

8. The steps outlined in this section shall apply each year during the term of the collective bargaining agreements.

## Article 10
## Vacations

1. Full-time Employees shall accrue vacation days based upon job title. Information regarding vacation entitlement shall be made available to each Employee at his/her time of hire. Employees who have completed twenty-six (26) weeks of employment shall accrue one-half year's worth of vacation time. Following the

9 UCP000172

initial twenty-six (26) week credit, Employees shall accrue vacation time per four (4) week cycle in accordance with UCP existing policy. Full-time Employees, other than those listed below, have the following annual vacation entitlement:

| Years of Service at UCP | Annual Vacation Entitlement |
|---|---|
| 1 – 3 | 10 days |
| 3 – 5 | 15 days |
| over 5 | 20 days |

Employees in job titles whose annual vacation entitlement is twenty (20) days upon completion of one (1) year of UCP service on the date of ratification of this Agreement shall continue to be so entitled.

2. Part-time Employees shall earn vacation days on a pro-rated basis.
3. Hourly Employees do not accrue vacation time.
4. Employees may carry over any unused vacation time into the next fiscal year (commencing July 1st).
   a. The amount of vacation time that may be carried over is limited to one and one-half (1 ½ ) times the annual accruals for full-time Employees
   b. The amount of vacation time that part-time Employees may carry over is pro-rated based on their part-time schedule and the prorated equivalent of the vacation limits for full-time Employees.
   c. Exceptions to the 4a limits may be granted in writing by the Executive Director or his/her designee only if the Employee makes a written request for vacation utilization by March 30th which has been denied. Denials of exceptions shall be neither arbitrary nor capricious.
5. Upon separation from employment, the Employer shall pay accrued but unused vacation leave up to the limits indicated above to Employees who provide the required notice or acceptable reason of hardship and according to applicable law.

## Article 11
## Holiday Leave

1. Full-time Employees are eligible to take off or accrue leave for the following paid Agency holidays:

| | |
|---|---|
| New Year's Day | Labor Day |
| Martin Luther King Day | Yom Kippur (weekday only) |
| President's Day | Presidential Election Day |
| Good Friday | Thanksgiving Day |
| Memorial Day | Friday after Thanksgiving |
| Independence Day | Christmas Day |

Agency holidays that fall on a Saturday will be observed on the Friday before. Agency holidays that fall on a Sunday will be observed on the following Monday.

2. Presidential Election Day, Good Friday and Yom Kippur are floating holidays.

10 UCP000173

3. An annual holiday schedule will be made available to all Employees at the beginning of each calendar year.

4. An Employee must be either at work or on paid leave on the workdays before and after a holiday to be paid for that holiday. An Employee who calls in sick before or immediately following an Agency observed holiday on which the Employee is scheduled to be off may be required to submit a doctor's note in order to receive holiday pay.

5. Full-time Employees will accrue one (1) day of holiday leave for an Agency observed holiday that falls on a regularly scheduled day off. Full-time Employees required to work on a holiday will be paid for the day worked and accrue one (1) day of holiday leave.

6. Part-time Employees may use or accrue holiday leave only for those Agency observed holidays that fall on a day on which they are regularly scheduled to work. Part-time Employees who work on a holiday earn holiday leave equivalent to the amount of time they work on the holiday to a maximum of eight (8) hours at the work site.

7. Residential Employees, including those who work on-call, shall be compensated at a rate equal to time and one half of their regular rate of pay for work performed on the following holidays:
New Year's Day (6 PM New Year's Eve – 6 PM New Year's Day)
Independence Day (July 4th)
Thanksgiving Day
Christmas Day (December 25th)

The Employer shall continue its policy of offering Employees the option to cash in holiday time accrued on these holidays.

8. Accrued holiday leave must be used by the end of the payroll period ending immediately before June 30th in the year in which it was earned, except as agreed to in writing by the Executive Director or designee upon written request from the Employee. Such requests from Employees who, prior to March 30th, have submitted and been denied a request to use holiday leave shall not be arbitrarily or capriciously denied.

9. Accrued but unused holiday leave may not be converted to pay upon separation from the Employer.

## Article 12
### Request to Use Accrued Holiday Leave or Vacation

1. Employees wishing to use accrued holiday or vacation time will submit a written leave request that includes the date of submission to their supervisor sufficiently ahead of time to plan for adequate staffing and program coverage. This form shall be approved or denied by the Employer and returned to the Employee within two (2) weeks of submission.

11 UCP000174

2. When scheduling holiday or vacation time, the supervisor will consider Employee preferences and agency needs. If the Employer is unable to accommodate the preferred vacation requests of all applicants, seniority shall govern among those applicants in the same job title applying simultaneously for the same dates. However if the senior applicant in the job title previously received his/her choice and other eligible applicants did not, the request of the senior eligible applicant in that job title who did not previously receive his/her choice shall have first preference for approval.

## Article 13
## Personal Days

1. Full-time Employees who have completed fifty-two weeks of continuous full-time employment shall accrue two (2) personal days per year on their anniversary date of hire.
2. Personal days must be used by full-time Employees prior to their anniversary date. They may not be carried into the next year or converted to pay upon separation from the Employer.
3. Hourly and part-time Employees do not accrue personal leave.
4. Employees shall request personal days of the Employer with as much advance notice as possible, but not more than three (3) months in advance, by completing an accrued leave request form that includes the date the request is submitted. The Employer shall respond in writing within two weeks of the date of the request.
5. In the event that two or more Employees request the same personal day(s), approval shall be granted in order of the date the requests are submitted, or by seniority in the event that requests are submitted on the same date.
6. All Employer approvals or denials shall be based upon consumer and operational needs and be at the sole discretion of the Employer.

## Article 14
## Sick Leave

1. Full-time Employees shall earn ten (10) paid sick days per year.

2. Part-time Employees shall earn paid sick days on a pro-rated basis.

3. Employees accrue paid sick leave from the beginning of their employment and become eligible to use such leave following thirteen (13) weeks of continuous employment.

4. Employees may carry over accrued sick leave into the next fiscal year (commencing July 1st). There is no limit on the amount of paid sick leave an Employee may accrue.

12 UCP000175

5. An Employee who is unable to report to work due to their own illness or illness of a child and who requests to use paid sick leave will contact his/her supervisor or their designee. Notification must be made one (1) hour in advance of the work day for Day Program Employees and two (2) hours in advance of the work day for evening, night, and weekend Employees, except in cases of proven inability to furnish such notice, and Employees shall continue to give such notification on a daily basis unless another arrangement has been made.

6. An Employee with no documented record of excessive sick time usage will not routinely be required to provide a doctor's note following less than three consecutive days of absence.

7. The value of accrued sick leave is not payable to an Employee upon separation from employment.

## Article 15
## Leaves of Absence

### A. Bereavement Leave

1. An Employee who completes twenty-six (26) weeks of continuous full-time employment is entitled to paid leave in the event of the death of a member of the Employee's family, as follows:
   a. a maximum of three (3) work days for the death of an immediate family member, defined as a parent, grandparent, spouse, sibling, or child.
   b. one (1) work day for the death of an aunt, uncle, parent-in-law, daughter-in-law, son-in-law.
2. Bereavement leave will be taken as close as possible to the time of death of the Employee's family member, however in no event more than one (1) month from the date of death.
3. An Employee who requires additional time-off for a death in the Employee's family may request to use accrued vacation, holiday, or leave without pay days, subject to  written approval from the Employer. Such requests shall not be unreasonably denied.
4. The Employer may request that the Employee provide documentation to verify the appropriate use of bereavement leave.
5. Part-time Employees are entitled to bereavement leave on a prorated basis.
6. Hourly Employees are not entitled to bereavement leave.

### B. Jury Duty

1. An Employee summoned for jury duty is expected to present a copy of the jury duty notice promptly to the Employer and to return to work whenever excused from jury duty and when it is concluded.
2. Full-time and part-time Employees will be paid by the Employer at their regular rate of pay for the duration of their jury service. Hourly or per diem Employees

UCP000176
13

who work regular shifts will be paid by the Employer for the first three (3) days of jury service, provided these are regularly scheduled work days for the Employee.

3. The Employer reserves the right to request that an Employee be excused from jury duty based upon agency needs.

4. The Employer may request and the Employee must submit documentation substantiating jury duty attendance.

## C. Military Leave

1. Leaves of absence for performance of duty with the US Armed Forces, with a reserve component of the National Guard thereof shall be granted in accordance with applicable law.

2. Employees who are eligible for vacation, personal, or holiday leave may use such leave while on military leave. Exhaustion of all leave credits is not required for military leave.

## D. Short-Term Disability Leave

1. The Employer and Employee will comply with the provisions of the NY State Disability Benefits Law.

2. Employees who have accrued leave may use available accrued leave during a period of short-term disability.

3. Employees receiving short-term disability benefits are also considered on FMLA leave simultaneously up to the first twelve (12) weeks of the FMLA year they are absent due to disability.

## E. Family and Medical Leave Act (FMLA)

The Employer and Employee will comply with the provisions of the Family and Medical Leave Act, as amended.

## F. Workers Compensation

The Employer and Employee will comply with the provisions of the New York State Workers' Compensation Law.

## G. Leave Without Pay

1. An Employee who completes fifty-two (52) weeks of continuous employment and has exhausted all paid leave may request a Leave Without Pay to a maximum of twenty-six (26) weeks for sickness or disability. The Employee will request such leave with as much advance notice as possible. The Employer shall respond in writing to the Employee, or verbally if there is not sufficient time from the date of the request, prior to the requested start date of the leave.

   a. In order to be eligible for such leave, the Employee will present medical verification that he/she is unable to work.

   b. An Employee who is on Leave Without Pay shall not receive compensation from the Employer, but may receive short-term disability or workers' compensation payments, where applicable, if such payments have not been exhausted during the Employee's paid leave.

UCP000177
14

    c. During an approved Leave Without Pay, the Employer shall maintain an Employee's existing benefits, including life, health, and disability coverage for a maximum of twelve (12) weeks. Employees who are unable to return to work after twelve (12) weeks will be notified in writing of the options and costs of continuing their existing benefits under COBRA.

    d. The Employer reserves the right to request periodic medical verification of an Employee's disability.

2. An Employee on FMLA leave for reasons other than his/her own disability may also be granted Leave Without Pay for the remaining fourteen (14) of the twenty-six (26) weeks if his/her need for such leave is substantiated by credible documentation.

3. An Employee does not accrue vacation, personal, holiday or sick days while on Leave Without Pay.

4. An Employee may request Leave Without Pay for compelling reasons other than his/her own disability or the disability of a family member. The Employee will request such leave with as much advance notice as possible.

    a. The Employer shall respond in writing to the Employee, or verbally if there is not sufficient time from the date of the request, prior to the requested start date of the leave. In evaluating whether to grant such a request, the Employer will consider the compelling nature of the request and agency needs. Such requests shall not be unreasonably denied.

    b. If Leave Without Pay is granted for reason other than disability, it is understood that the same policies apply regarding the duration of the leave, documentation related to the reason for the leave, and Employee rights upon return from the leave.

5. Employees who are unable to work and denied leave without pay will be informed in writing by the Employer of their placement on non-active status for a period of ninety (90) days. Non-active Employees shall be entitled to continue medical coverage as allowed by COBRA, as well as Worker's Compensation and disability benefits in accordance with the determination of the carrier and the law. Employees who notify the Employer during this ninety (90) day period of their ability to return to work and perform the full duties of the job will be given reasonable consideration for reinstatement to their position (if still available) or to another position within the agency. Employees who do not contact the Employer within ninety (90) days of being placed on non-active status or are unable to return to full duties will be terminated.

6. An Employee planning to return from Leave Without Pay shall notify his/her supervisor at least two weeks before the scheduled date of return and submit medical clearance stating that he/she can return to work and perform the full, essential duties of his/her job. The Employer will make reasonable efforts to reinstate an Employee who returns from Leave Without Pay to a similar position within the Agency.

UCP000178

15

### Article 16
### Voluntary Benefits

The Employer will continue its current policy on the following voluntary benefit programs—Transitcheck, 403(b), Life Insurance (term or universal), Flexible Spending accounts, Municipal Credit Union, and Short term Disability.

### Article 17
### Tuition Assistance

1. UCP will continue its policy of tuition assistance to bargaining unit Employees on the same terms as other UCP employees.

2. Copies of the Employer's policy regarding participation in this program shall be provided to Employees upon request.

### Article 18
### Employee Referral Program

1. Employees shall be eligible to participate in UCP's Employee Referral Program to the same extent as non-bargaining unit employees.

2. Copies of the Employer's policy regarding participation in this program shall be provided to Employees upon request.

### Article 19
### Administration of Medication

1. UCP and the Employees shall comply with all applicable laws and regulations regarding the administration of medication by Employees to consumers.

2. The Employer will make reasonable efforts to provide Employees with the opportunity to take and complete AMAP training prior to the end of the Employee's probationary period.

3. The grandparenting policy with regard to current Employees not required to administer medication to consumers will remain in effect.

16 UCP000179

## Article 20
## Driving of Agency Vans

1. UCP and the Employees shall comply with all applicable laws and regulations regarding the driving of agency vans.

2. Employees will not be required to drive an agency van until they have held a valid driver's license for six months and have completed the agency's training program.

3. Direct care staff required to drive agency vans will be given priority to take the agency's defensive driving course.

4. The following Employees shall continue to be grandfathered from driving:
   - Employees hired before June 18, 2003 who have not driven an agency van while employed at the agency.

5. Upon request to the Employer, Employees issued a summons for moving or non-moving violations while using an agency vehicle will be provided with the opportunity and documentation to dispute the summons at the Traffic or Parking Violations Bureau.

## Article 21
## Fingerprinting and Employee ID Cards

Management will continue its policy of covering the costs of fingerprinting and the initially issued UCP employee identification card.

## Article 22
## Employee Expenses and Reimbursement

Employees will be reimbursed within a reasonable time period following submission of receipts or other acceptable documentation for reimbursable expenses.

## Article 23
## Training of Employees

The Employer shall comply with OMRDD policies and regulations regarding training of employees.

17 UCP000180

### Article 24
### Past Practices

The Employer, in compliance with the law, will subject to negotiations, continue all past practices involving wages, hours and terms and conditions of employment.

### Article 25
### Hours of Work

**A. Regular Work Day and Work Week**
   1. The hours per week regularly worked by a full time or part-time Employee shall not be reduced during the term of the Agreement, except for lack of work. If the hours of Employees in a particular title must be reduced because of lack of work, the least senior Employees in the title at the bargaining unit site shall have their hours reduced or eliminated before more senior Employees, provided the remaining Employees are qualified to do the work required.
   2. Employees who regularly work at least four (4) hours a day shall have a meal period of not less than thirty minutes per day.
   3. For all Employees entitled to a meal period longer than thirty (30) minutes on the date of ratification of this Agreement, the Employer shall continue its current policy regarding meal period entitlements.
      The Employer shall inform Employees in writing at the time they are hired of:
      a. the daily starting and ending time of their shift
      b. the length of their meal period
   4. If it becomes necessary to change an Employee's work schedule/shift at any site, the Employer shall seek qualified volunteer(s) in the affected title at that site. If there are no, or an insufficient number of qualified volunteer(s), the Employer shall change the work schedule/shift of the least senior qualified Employee(s) in the affected title at that site. An Employee whose schedule/shift is involuntarily changed shall be informed of the reason for the change, provided advance notice before implementation and preference to revert to his/her previous work schedule/shift if an opportunity becomes available to do so within one year of the involuntary change of schedule.

**B. Timekeeping**
   1. The Employer will continue its current policy regarding procedures for completion and review of time and attendance sheets.
   2. Effective no later than August 29, 2006, the Employer will, after an Employee's completion and submission of time and attendance sheets, begin providing On-call Employees with a record of their days and hours worked during each pay period.
   3. Salaried staff who move to on-call status shall be paid for their existing balance of accrued vacation time, to a maximum of one and one half (1 ½) times their annual vacation accruals.

UCP000181

18

## C. Overtime

1. Employees shall be paid at their regular hourly pay rate for authorized time worked in excess of their regularly assigned hours of work, up to forty (40) hours per week.

2. Employees shall be paid additionally at one and one-half (1 ½) times the Employee's regular hourly pay rate for authorized time worked in excess of forty (40) hours in a work week.

3. If overtime is necessary, the Employer shall first seek qualified volunteers in the job title(s) at the bargaining unit work site where the need arises. If an insufficient number of qualified Employees volunteer, overtime shall be assigned to qualified, on-duty Employees in the job title(s) at the bargaining unit work site where the need arises, in reverse order of seniority.

4. Notice of overtime shall be given to Employees as soon as is reasonable for the need to have become known to the Employer.

## D. Training and Staff Meetings

1. Employees shall be compensated for all time spent attending training or staff meetings beyond their regular hours of work.

2. With the exception of AMAP training, The Employer will offer alternative arrangements for Employees who, due to compelling personal circumstances, are unable to attend training or staff meetings beyond their regular hours of work. Employees must attend the next training session for which they are scheduled.

3. Employees who complete OMRDD required training for which certification is issued shall receive a copy of their certification upon request.

### Article 26
### Overnight Trips

Upon being asked to accompany consumers on overnight trips, the Employer shall provide Employees with a fact sheet on such trips as agreed between the parties.

### Article 27
### Vacancies, Transfers, Promotions, Layoffs and Recalls

## A. Posting Vacancies

The Employer shall post vacancies showing the work hours and locations of bargaining unit positions for at least five days. The posting shall be dated. Applicants shall be transferred or promoted to such bargaining unit vacancies as set forth below.

UCP000182

**B. Voluntary Transfers and Promotions**

1. When two or more applicants apply in writing for a lateral transfer to a bargaining unit vacancy or promotion to a bargaining unit vacancy, an applicant shall be selected by UCP taking competency, agency needs, consumer needs and job performance into consideration. As used herein, a "lateral transfer" is a transfer to a comparable position at a comparable pay level. A promotion is a transfer to a higher paid position.

2. Part-time residential unit Employees shall have preference over on-call Employees for additional hours and for full-time positions based on their seniority, if they meet the posted qualifications. Residential Employees who work on-call shall have preference for regular part-time or full-time residential positions over new hires (but not over part-timers), if they meet the posted qualifications. The Employer may, on infrequent occasions, not transfer or promote part-timers or on-callers due to criteria listed in B1. The Employer shall not act arbitrarily or capriciously in this regard.

**C. Layoffs and Recalls**

1. The Employer shall notify the Union of an impending layoff of bargaining unit members, and it shall meet promptly, if requested by the Union, to try to resolve any issues, including possible alternatives to layoffs, before layoffs are implemented.

2. In the event of a reduction in force in the bargaining unit, the least senior Employee in the relevant bargaining unit job title shall be laid off provided the remaining Employees are qualified to do the work required. The Employer shall give affected Employees at least thirty days' written notice of layoff. Part-time Employees are laid off and recalled separately from full-time Employees.

3. Laid off Employees shall be placed on a list for recall to the same or a comparable position with the Agency when one becomes available. Probationary Employees who have been laid off have no recall privileges.

4. The Employer shall offer vacant bargaining unit positions that subsequently become available to qualified Employees on recall lists in seniority order before posting them and filling them.

5. Employees recalled to work are expected to return within fourteen (14) calendar days after recall sent certified mail by Employer to the Employee at his/her address of record on file with the Employer except where verifiable serious illness or other provable reason acceptable to the Employer makes it impossible for the Employee to return on time. The Employee shall notify the Employer of his/her acceptance or rejection of the recall and the reason for any inability to return on time within three (3) days after recall.

6. An Employee who is recalled from layoff to a non-bargaining unit position but who requests to be returned to the bargaining unit shall be transferred back into a bargaining unit vacancy in accordance with his/her seniority if an appropriate bargaining unit vacancy occurs for which the Employee is competent and qualified.

7. The recall rights of Employees are effective until one year following their date of layoff.

UCP000183
20

### D. Transfers Within the Unit

1. The Employer may transfer Employees from their work site to another work site for reasons of agency or consumer needs. Said transfers shall be neither arbitrary nor capricious.
2. Before involuntarily transferring any Employee from their work site to another work site, the Employer shall seek qualified volunteer(s) in the title. If there are no, or an insufficient number of qualified volunteer(s), the Employer shall transfer the least senior qualified Employee(s) in the title from their work site to another. An Employee who is to be involuntarily transferred within the unit shall be informed of the reason for the transfer and provided with advance notice.
3. Upon their request, Employees shall be transferred back to their work site as soon as practical.
4. The Employer may transfer an Employee within the Unit for disciplinary reasons, without adhering to D2 or D3. Such transfers shall be made in consultation with the Union.
5. The parties have agreed to this provision with the expectation that it will be used infrequently.

### E. Transfers Out of the Unit

1. The Employer may transfer Employees out of the bargaining unit for reasons of agency or consumer needs. Said transfers shall be neither arbitrary nor capricious.
2. Before involuntarily transferring any Employee out of the bargaining unit, the Employer shall seek qualified volunteer(s) in the title. If there are no, or an insufficient number of, qualified volunteer(s), the Employer shall transfer the least senior qualified Employee(s) in the title. An Employee who is to be involuntarily transferred out of the unit shall be informed of the reason for the transfer and provided advance notice.
3. Upon their request, Employees shall be transferred back into the bargaining unit as soon as practical. Employees transferred out of the bargaining unit shall suffer no reduction in fringe benefits.

### F. Disputes

Disputes arising under this Article are subject to grievance and arbitration, but an arbitrator may not substitute his/her judgment of competency, consumer needs, qualified agency needs and job performance for that of UCP's determination unless UCP's determination is arbitrary or capricious.

**Article 28**
**Due Process**

### A. Disciplinary Interviews

The Employer, the Union and Employees shall abide by the *Weingarten decision*, as amended by law, when an Employee requests Union representation at a disciplinary interview with Management.

UCP000184
21

**B. Discipline and Discharge**
   1. The Employer shall have the right to discharge, suspend, or discipline any Employee for just cause.
   2. Employees who are found, pursuant to an arbitration proceeding, to have engaged in a heinous or detestable act of abuse against a consumer, will be terminated. Employees who have been the subject of false or inconclusive accusations of such an act will be made whole.

**C. Employee Investigations**
   The parties have agreed to a "Fact Sheet on the Investigation Process", a copy of which is contained in Appendix B and deemed a part of the collective bargaining Agreement.

## Article 29
### Grievance and Arbitration Procedure

**A. Definition**
A grievance is a claim that a provision of this Agreement has been violated. The Union or the Employer may initiate a grievance.

**B. Informal Resolution**
It is the intent of the parties to resolve individual grievances promptly, without recourse to the formal grievance procedure. Therefore, an individual grievant and the Chapter Leader (or his/her designated representative) shall meet with the immediate supervisor and attempt to resolve the grievance informally. If there is no resolution, the formal grievance procedure shall apply.

It is mutually agreed that nothing herein will prevent the Employee from voluntarily discussing problems with his/her supervisor or other representatives of Management with or without his/her union representative prior to initiating a formal grievance or prior to exercising his/her Weingarten Rights under Article 28 (Due Process) of this Agreement. However, neither the Employer nor the Union shall intimidate, coerce, or cause an Employee or Manager to suffer any reprisals, either directly or indirectly, that may adversely affect his or her hours, wages, or working conditions as the result of the exercise of his or her rights under this Article.

**C. Formal Grievance Procedures**
1. Grievances Initiated by the Union
Upon request of either party, the Union and the Employer will exchange lists of individuals who may act in the capacity of "designated representative" (for the Union) and "designee" (for the Employer) at Step One and Step Two, and update as appropriate

### Step One

A formal grievance shall be submitted by the Union to the Employer's Designee ("Designee") within ten days of the date the facts giving rise to the grievance were known to the grievant or reasonably should have been known. The grievance shall be in writing and shall set forth the claim and identify the contractual provision(s) alleged to have been violated and the bargaining unit member(s) affected. It shall also set forth the remedy sought.

The Designee or designated alternate shall meet with the grievant and the Chapter Leader (or his/her designated representative) within ten days of the submission of a formal grievance. The written decision of the Designee, will be given to the Chapter Leader (or his/her designated representative) and the grievant within ten days of the meeting at this Step.

### Step Two

If the grievance is not resolved at Step One, the Union may appeal in writing to the Executive Director of UCP (or designee) within ten days after receiving the Step One answer. The Executive Director or designee shall meet with the grievant and the Chapter Leader (or his/her designated representative) within ten days after receipt of the appeal and attempt to resolve the grievance. The answer of the Executive Director or designee shall be given in writing to the Union within ten days after the meeting and shall set forth the reason if the grievance is denied.

2.  Group Grievances
    Upon written agreement of the Union and the Employer, the Union shall have the right to initiate a Step Two grievance which affects a substantial number or class of Employees and which the Employer's representative designated in Step One lacks authority to settle. Such grievance shall be filed within ten days after the facts giving rise to the grievance were known or reasonably should have been known.

3.  Grievances Initiated by the Employer
    UCP may file a grievance against the Union by submitting to the Union President (or designee) a written statement of the grievance within ten days of the date the facts giving rise to the grievance were known to UCP or reasonably should have been known. A meeting between UCP and UFT to discuss the grievance will be convened within ten days thereafter. In the event that UCP and UFT are unable to resolve the grievance, the grievance may be submitted to arbitration by the Employer in the same way the Union submits its grievances to arbitration hereunder.

## D. Arbitration

If the grievance is not resolved at Step Two, the Union, within fifteen days after receiving the Step Two answer or after the failure to answer within the time limit, may submit a notice of arbitration to the Employer, with a copy to the American Arbitration Association (AAA). The notice shall include a brief statement setting

UCP000186

23

forth the issue to be decided by the arbitrator, the specific provision(s) of the Agreement involved and the remedy sought.

The Union shall request the AAA to submit simultaneously to each party an identical list of names chosen from the Panel of Labor Arbitrators for selection of an arbitrator, in accordance with the Labor Arbitration Rules of the AAA, to hear and decide the case.

The arbitration shall be handled in accordance with the then existing Labor Arbitration Rules of the AAA related to the hearings and fees and expenses. The arbitrator shall have no authority to add to, subtract from, alter, amend or in any way modify the terms and provisions of the Agreement. The fees and expenses of the arbitration shall be borne equally by the Employer and the Union. Each party shall bear the expenses of preparing and presenting its case at arbitration. The arbitrator's written decision and opinion shall be issued not later than thirty days from the close of the hearings. The decision shall be final and binding on the Union, the Employer and the Employees.

E. Time Limits

    1.    The time limits specified in this Article shall be deemed to be exclusive of Saturdays, Sundays and holidays.

    2.    Failure on the part of the Union to appeal a grievance to the next step within the specified time limit shall be deemed to be acceptance of the decision rendered at that step. Failure on the part of the Employer to answer a grievance at any step within the specified time limit shall not be deemed acquiescence thereto and shall entitle the Union to proceed to the next step or to arbitration, as applicable.

    3.    A grievance concerning discharge or suspension may be initiated by the Union at Step Two of the formal grievance procedure provided that it is initiated within the time period set forth in Step One.

    4.    In any specific grievance the time limit at any step may be extended by written agreement between the Employer representative at that step and the Chapter Leader (or his/her designated representative).

    5.    Failure on the part of the Union or the Employer to submit a grievance within the time limits shall result in the forfeiture of the right to file the grievance with prejudice.

**Article 30**
**Personnel Files**

1. There shall be only one official personnel file for each Employee located within the UCP Human Resources Department. Each Employee shall have free access (which shall not be abused) to his/her file for the purpose of examination and making copies of materials within the file.

UCP000187

2. Materials placed in the personnel file should only be job-related and not related to personal matters—such as family situations, etc.

3. No materials except those to which the Employee has had a chance to read, sign and/or respond to in writing shall be placed in the file.

4. Material in the personnel file that is shown to be false or inaccurate as a result of a grievance arising under Article 28B (Discipline and Discharge) shall be corrected or expunged as appropriate, in accordance with the express terms of the decision in the grievance or arbitration.

### Article 31
### Confidentiality

The parties will comply with the agency's confidentiality policy.

### Article 32
### Health and Safety

1. The Employer, the Union and the Employees shall comply with applicable Federal, State, and City health and safety statutes, rules, and regulations.

2. The Employer will respond in a timely fashion to health and safety issues.

### Article 33
### Separation From Employment

1. Any Employee who terminates his/her employment by resignation shall give the Employer two (2) weeks advance written notice.

2. Exceptions to the two weeks written notice requirement for reasons of hardship shall not be unreasonably denied.

3. The effective date of notice is the date the resignation letter is received in the Director's Office. Upon receipt of such notice, the Director or his/her designee will provide the Employee with a written acknowledgment of the effective date of resignation.

4. Upon separation from employment, the Employer shall pay the following to Employees who provide the required notice and according to applicable law— accrued but unused vacation time to a maximum of one and one-half (1 ½ ) times the annual accrual for full time Employees; or for part-time Employees, the pro-

25 UCP000188

rated equivalent based upon their part-time schedule and the pro-rated vacation limits for full-time Employees.

5. If the above notice and dates are not complied with, except in cases of hardship as above, an Employee shall forfeit accrued but unused vacation time. Accrued unused sick, personal days, and holidays are not payable at termination or resignation.

6. During the resignation notice period Employees will not be entitled to use sick, vacation, floating holidays, or personal time.

### Article 34
### Severability

Should any part of this Agreement or any provision contained herein be rendered or declared invalid by reason of any existing or subsequently enacted legislation or by a court of competent jurisdiction, such invalidation of such part or provision of this Agreement shall not invalidate the remaining portions of this Agreement and they shall remain in full force and effect. Neither shall any provision of this agreement negate any applicable stature or regulation.

This Agreement shall constitute the sole and entire agreement between the parties with respect to rates of pay, wages, hours and all other conditions of employment. It may not be amended, modified, waived, extended or otherwise revised except by agreement in writing duly executed by the parties.

### Article 35
### No Strike- No Lockout

1. During the term of this Agreement, the Union, on behalf of its officers, agents and members, agrees that there shall be no strikes (economic, unfair labor practice, sympathy or otherwise), slowdowns, walkouts, sit-downs, picketing or boycotts which interfere in any manner with the Employer's operations. Such prohibition does not prevent off duty Employees or Union staff from engaging in lawful organizing activities at non-organized employer facilities.
2. During the term of this Agreement the Employer, on behalf of its officers, administrators, supervisors and agents, agrees that there shall be no lockouts of Employees covered by this Agreement.
3. The term "strike" shall include a refusal to report for work because of a primary or secondary picket line at the Employer's premises so long as the Employer provides safe access to its premises.
4. If during the term of this Agreement a strike or a lock-out occurs, the Union (if there is a strike) or Employer (if there is a lock-out) within twenty-four hours of a request by the other party shall:

26UCP000189

    a.  Publicly disavow such action
    b.  Advise the other party in writing that such action has not been called or sanctioned by it.
    c.  Notify the participants of its disapproval of such action, instruct them to cease the action and return to work immediately.

**Article 36**
**Management's Rights**

1. Except as otherwise specifically provided, limited or modified by this Agreement the Employer retains the exclusive right to manage the business, to direct, control and schedule its operation and workforce, and to make any and all decisions affecting the business whether or not specifically mentioned herein and whether or not heretofore exercised. Examples of such prerogatives shall include, but not be limited to, the sole and exclusive rights to: hire, promote, layoff, assign, transfer, suspend, discharge and discipline Employees; select and determine the number of Employees, including the number assigned to any particular work; increase or decrease that number; direct and schedule the workforce; determine the location and type of operation; determine and schedule when overtime shall be worked; install or remove equipment and determine the methods, procedures, materials and operations to be utilized provided that Employees shall be trained by the Employer in the safe and effective use of any such equipment, methods, procedures, materials and operations; transfer or relocate any or all of the operations by sale or otherwise, in whole or in part; determine the work duties of Employees; promulgate, post and enforce rules and regulations governing the conduct and acts of Employees during working hours; discontinue or reorganize or combine any operation with any consequent reduction or other change in the workforce; establish, change, combine or abolish job classifications; determine work performance levels and standards of performance of the Employees and in all respects carry out the ordinary and customary functions of management.

2. The Employer's failure to exercise any of the functions stated herein shall not constitute a waiver thereof.

3. The Employer has the right to schedule its management and supervisory personnel. Supervisors will not regularly perform bargaining unit work, but may do so as necessary. The selection of supervisory personnel shall be the sole responsibility of the Employer, and such selection shall not be subject to the grievance and arbitration provisions of this Agreement.

4. The foregoing statement of the rights of Management and of Company functions are not all-inclusive, but indicate the type of matters or rights which belong to and are inherent in management and shall not be construed in any way to exclude other ordinary and customary Employer functions not specifically enumerated above.

5. It is understood that upon demand by the Union, the Employer shall negotiate regarding its decisions and/or the impact of the decisions as mandated by applicable law.

UCP000190

27

### Article 37
### Cooperation Between the Parties

UCP and the UFT will cooperatively attempt to maximize UCP revenues and funding and enhance employee salaries and benefits by approaching City, State, and Federal governments. Utilization of said enhanced revenues and funding will be discussed by the parties in advance.

For the Union:

Date 9/21/10

For the Employer:

Date 9/21/10

28 UCP000191

## Exhibit A
### Payroll Deduction Authorization

Pursuant to applicable law, I assign to the United Federation of Teachers (UFT) from my compensation as any employee of United Cerebral Palsy of NYC (hereinafter called "my employer") one percent (.01) of my gross pay or such different amount as UFT fixes as its regular dues, and direct my employer to withhold this sum from the compensation due me each pay period and remit it to the UFT.

I submit this assignment and authorization with the understanding that it will be effective and irrevocable for a period of one year from this date or up to the termination date of the current Collective Bargaining Agreement between my employer and the UFT, whichever occurs sooner.

The authorization and assignment shall continue in full force and effect for yearly periods beyond the irrevocable period set forth above and each subsequent yearly period shall be similarly irrevocable unless revoked by me within the 30 day period preceding expiration of such irrevocable period. Such revocation shall be effected by simultaneous written notice by registered or certified mail to my employer and the UFT which must be delivered within such 30 day period.

The assignment and authorization are effective at once.

Date      _____

Employee Signature   _____

UCP000192

## APPENDIX B

### Fact Sheet on the Investigation Process

The following steps are taken when an allegation of client abuse is made against an agency Employee.

1. An Incident Report Form is completed and submitted to the Program Director.

2. An Employee accused of client abuse will immediately be placed on administrative leave. This means suspended without pay. During the period of administrative leave, the Employee is not permitted on any agency property unless he/she receives prior approval from his/her Program Director.

3. The agency will assign a member of Management to investigate the allegation(s) of abuse. The investigator should not work at the site or be responsible for supervising the site of the Employee under investigation.

4. The investigator will explain to each Employee witness the reason behind the investigation. He/she will also inform each Employee witness that regulations and agency policy require them to cooperate in an investigation. Employees who refuse to cooperate in an agency investigation or sign a statement will be informed that they may face disciplinary action.

5. Interviews will be conducted in a place that provides privacy.

6. The investigator will interview potential witnesses, including staff and clients. He/she will also interview the affected client and staff member who was placed on administrative leave.

7. The investigator will take statements from witnesses, the affected client and the Employee being accused. Individuals who provide statements will be asked to read their statements or, if necessary, will have their statements read back to them, suggest any changes, and then sign them. These individuals are not entitled to and will not receive a copy of their statements.

8. Employees entitled to union representation, pursuant to their Weingarten Rights, may be accompanied by the representative during questioning.

9. The investigation is usually concluded within five working days of the date that the alleged abuse was reported to the Program Director.

UCP000193

10. Based on the results of this investigation, one of the following actions will be taken:
   - If the charges are substantiated, the Employee will be terminated retroactive to his/her date of suspension and not entitled to any back pay.
   - If the charges are false or inconclusive, the Employee will be reinstated with full back pay.
   - In some cases where the results of an investigation are inconclusive, the affected Employee may be transferred to another program. This Employee will be reinstated with full back pay.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x    Docket No.: 12-CV-2149
SHERRY GRANT,

                Plaintiff,

        -against-

UNITED FEDERATION OF TEACHERS, UNITED
CEREBRAL PALSY OF NEW YORK CITY, INC.,
EVERETT WATTS, and PATRICIA TRAYNOR,

                Defendants.
----------------------------------------------------------------------x

---

**AMENDED COMPLAINT**

---


---

**Kathy A. Polias**
**Attorney-at-Law**
**155 Water Street**
**Brooklyn, NY 11201**
**Tel. No.:  (718) 514-2062**

---