UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

SHERRY GRANT,

                Plaintiff,

      -against-

UNITED FEDERATION OF TEACHERS,
UNITED CEREBRAL PALSY OF NEW YORK
CITY, INC.,

                Defendants.

-----------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 1 2 2014 ★

BROOKLYN OFFICE

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
12-cv-02149 (CBA) (VMS)

Plaintiff Sherry Grant brings this action pursuant to the National Labor Relations Act

("NLRA"), 29 U.S.C. §§ 151 et seq., the Labor Management Relations Act, 29 U.S.C. §§ 141 et

seq., the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New

York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107, against Defendants

United Federation of Teachers ("UFT" or "the union") and United Cerebral Palsy of New York

City, Inc. ("UCP"). Both defendants now move to dismiss Grant's second amended complaint

(or the "complaint") for failure to state a claim, pursuant to Federal Rule of Civil Procedure

12(b)(6). The motions are granted in part and denied in part.

## BACKGROUND

The complaint alleges the following facts. Grant was employed by UCP as a Residence

Program Specialist from 2000 to 2011. (Second Amended Complaint ("SAC") ¶ 8.) She was

also a member of the labor union UFT and the beneficiary of a collective bargaining agreement

between UCP and UFT that was in effect between December 30, 2009, and June 29, 2012 (the

"CBA"). (Id.)

In January 2011, Grant filed an action against UCP in the Southern District of New York,

alleging that, while working at UCP, she was subject to sex discrimination as well as retaliation

1

for complaining about sex discrimination and subsequent retaliation. See Grant v. United Cerebral Palsy of N.Y.C., Inc., No. 11-cv-0018 (S.D.N.Y.) ("Grant I"). Prior to bringing that lawsuit, Grant had made complaints about sex discrimination to managerial staff at UCP, as well as to the Equal Employment Opportunity Commission and the New York State Division of Human Rights ("NYSDHR"). (SAC ¶ 9.) Grant alleges that, at all relevant times, UFT was aware of Grant I, as she informed Thara Boucicault, her UFT Chapter Leader, about the suit. (Id. ¶ 14.)

In October 2011, Grant was the subject of an allegation that she was heard saying that a client should burn to death. At that time, she worked at UCP's Landings site located in Brooklyn. (Id. ¶ 10.) Grant alleges that UCP required her to stay home for at least two weeks pending the outcome of an investigation into the incident, even though two other employees subject to allegations by the same client were allowed to continue working during the investigation. (Id.)

In late October or early November, the investigation determined that the allegations against Grant were "unfounded." (Id. ¶ 11.) Although Grant was allowed to return to work, she was transferred to a different site located at E. 51st Street in Brooklyn. (Id.) At the new site, Grant was scheduled for ten hours less work than at the Landings site, and therefore was paid less. (Id.) The other two employees who were the target of allegations were not transferred and did not suffer a reduction in hours or wages. (Id.) Grant alleges that the transfer and reduction in hours violated Article 25(A)(1), Article 27(D), and Article 28(B) of the CBA. (Id. ¶ 13.)

On or about November 3, 2011, Grant requested that UFT file a grievance on her behalf regarding the transfer. Although aware that Grant had been transferred in spite of the allegations against her being deemed unfounded, UFT "indicated an unwillingness to file a grievance." (Id.

2

¶ 14.) Grant claims that UFT had filed grievances for other union members on issues that were "less grave and serious." (Id.)

On or about November 16, 2011, Grant was called to a meeting, which was attended by Everett Watts, Residential Director of UCP's Landings site, Patricia Traynor, Coordinator of Operations at UCP, Olivia Wint, a UFT employee, and Boucicault, Grant's UFT chapter leader. (Id. ¶ 15.) Prior to the meeting, Boucicault had informed Grant that the meeting "was to confirm her schedule at the E. 51st Street site and to give her back the hours she had lost." (Id.) However, at the meeting, Grant was informed that UCP wanted to transfer her again. (Id. ¶ 16.) According to the complaint, Wint, who was at the meeting because UCP "had asked her to intervene" (id. ¶ 15), "took over the 'representation' of" Grant, but "overtly sided with and defended UCP" (id. ¶ 16). Wint informed Grant that she had to accept one of two transfer options offered by UCP, or else remain at home without pay. (Id.) Neither transfer option was acceptable to Grant: One was located in Staten Island, far from Grant's home; the other, although located in Brooklyn, would have required her to work a schedule that would have "inflicted undue hardship on" Grant because she "had a young baby at home and . . . the workload [at that location] was exceptionally grueling." (Id.) The complaint also faults Wint for not questioning Traynor when she stated that the clients at the E. 51st Street site did not like Grant, and for failing to challenge UCP's claim that it had no other placement options in Brooklyn. (Id.) "Instead, Ms. Wint kept angrily repeating that [Grant] had to take one of the . . . adverse transfer options or stay home without pay." (Id.) During the meeting, however, Boucicault questioned why UCP was attempting to send Grant to another borough, and sent Grant a text message advising her not to take the Brooklyn assignment because of the grueling

workload. (Id.) Grant alleges that UCP's attempt to transfer her a second time breached the CBA. (Id. ¶ 18.)

After the November 16 meeting, Grant repeatedly contacted UFT representative Ilene Weinerman regarding what had occurred. (Id. ¶ 19.) Nonetheless, UFT, despite being "aware that UCP was violating the" CBA, indicated "an unwillingness to grieve UCP's adverse transfer" of Grant from the Landings site to the E. 51st Street site, or UCP's efforts to again transfer her during the November 16 meeting. (Id.) UFT instead told her that she had no choice but to take one of the newly-offered positions, despite the fact that other positions comparable to Grant's original position at the Landings site were available. (Id.) Grant ultimately refused to accept either of the offered positions, and, following the November 16 meeting, remained at home without pay throughout the remainder of the time period relevant to the complaint. (Id. ¶ 20.)

In mid-December 2011, UFT filed a grievance on behalf of Grant, challenging her initial placement on unpaid leave following the client abuse allegation and her transfer from the Landings site (the "December 2011 grievance"). (Id. ¶ 20.) In early April 2012, a "Step One" meeting – the first stage of the formal grievance process established by the CBA – was held between Grant, Wint, Boucicault, and representatives of UCP. (Id. ¶¶ 20-21.) Grant alleges that at that meeting, UFT did not advocate for her to be reinstated at the Landings site, or otherwise "discuss the substance of the purported grievance." (Id. ¶ 21.) Instead, UCP offered Grant a few placement options at other sites, each of which was for fewer hours than she worked at the Landings site. Grant attempted to accept one of the placements; however, in order for her to do so, UFT required her to sign a statement agreeing "'that she has been fully and fairly represented by the UFT with respect to the negotiation and execution of this Agreement.'" (Id.) Grant refused to sign the agreement, and was precluded from returning to work. (Id.) Grant does not

4

allege what action was taken with regard to the December 2011 grievance subsequent to the Step One meeting.[1]

Grant commenced this action on May 1, 2012. (Docket Entry ("DE") 1.) As part of discovery in this case before her amended complaints were filed, Grant deposed Alan Seiler, Director of Human Resources at UCP until early 2012. During that deposition, Seiler informed Grant that, although he was responsible for hearing appeals on behalf of UCP during "Step Two" of the grievance process, he never put his reasons for denying grievances in writing, despite the CBA's requirement that any denial be explained in writing. (SAC ¶ 22; UCP-UFT Collective Bargaining Agreement ("CBA"), Art. 29(C)(1).) In her second amended complaint, Grant alleges that UFT never challenged Seiler's failure to put reasons for denials in writing. (SAC ¶ 22.) Although Grant does not allege that this failure affected her December 2011 grievance, she claims that it prejudiced grievances she filed in July 2009 and December 2009, as well as two grievances filed in March 2010 (collectively, the "2009 and 2010 grievances"), by making it impossible for UFT to assess whether to challenge the denials of the grievances through arbitration. (Id. ¶ 24.) In each of those instances, Grant's grievances were denied at Step Two, and UFT did not thereafter seek arbitration. (Id.)

Based on these allegations, Grant claims that UFT breached its duty of fair representation by (1) refusing to file a grievance on Grant's behalf for a significant period of time after her transfer from the Landings site, (2) failing to represent her interests at the November 16, 2011 meeting, (3) prosecuting the December 2011 grievance in an untimely manner, (4) failing to

---

[1] A letter from UFT to Grant, filed as an exhibit attached to Grant's response to UFT's motion to dismiss, indicates that Grant's "Step Two grievance" was deemed "abandoned" by the union. (Affirmation of Kathy A. Polias, Ex. 2 (Docket Entry 33-2).) Because the complaint does not rely on that letter and as it is not otherwise integral to the complaint, the Court cannot consider it while evaluating a motion to dismiss pursuant to Rule 12(b)(6). See Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991) (in evaluating motion to dismiss, court may only consider facts in complaint, documents incorporated by reference into complaint, or matter which the court may take judicial notice of).

represent her interests at the April 2012 Step One meeting, (5) conditioning her return to work on her signing an agreement releasing UFT from any liability related to its representation of her, and (6) failing to require Seiler to put his reasons for denying Grant's 2009 and 2010 grievances in writing. (Id. ¶¶ 26-29.) Additionally, Grant claims that UFT's refusal to file a grievance or otherwise effectively represent her constituted retaliation for her lawsuit against UCP in Grant I, in violation of the NYSHRL and the NYCHRL. (Id. ¶¶ 14, 40-43.)

Grant further claims that UCP breached the terms of the CBA by (1) reducing her hours, even though less senior employees' hours were not reduced and there was not a shortage of work, (2) transferring her from the Landings site to the E. 51st Street site arbitrarily, without any disciplinary basis, against her will, ahead of less senior employees, and without informing her of the reason for the transfer, and (3) mandating, at the November 16, 2011 meeting, that Grant accept another transfer to one of two locations, or else stay at home without pay. (Id. ¶¶ 30-39.) She also claims that UCP's conduct constituted retaliation for her Grant I lawsuit, in violation of the NYSHRL and the NYCHRL. (Id. ¶¶ 44-47.)

### STANDARD OF REVIEW

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In adjudicating a motion to dismiss pursuant to Rule 12(b)(6), a district court accepts the factual allegations in a complaint as true and draws all reasonable inferences from those facts in the plaintiff's favor. Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." Id. A complaint need not include "detailed factual allegations," but mere "labels and conclusions" will not suffice. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. "Determining whether a complaint states a plausible claim" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

In resolving a motion to dismiss, "consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991). A court may take judicial notice of the fact of publicly-filed documents; however, it may not take judicial notice of such a document for the truth of the matter asserted in it. Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

## DISCUSSION

### I.     Claim Splitting

Initially, UCP argues that Grant's claims against it should be dismissed because she has impermissibly split between this action and Grant I claims arising out of the same facts. Grant's original complaint in Grant I, filed January 3, 2011, asserted hostile work environment and retaliation claims under federal and state law against UCP. That complaint described several incidents of harassment and gender bias on the part of UCP supervisors, and alleged that, after Grant complained about that treatment, she was transferred without cause from the location where she had worked for several years to another unit. Additionally, it alleged that after Grant filed a charge with the NYSDHR, she was subjected to unwarranted disciplinary action. In January 2012, Grant moved to amend the complaint in the S.D.N.Y. action, seeking, in part, to

7

add allegations related to the October 2011 client abuse allegation and the subsequent transfer of Grant from the Landings site. (See Appendix of Exhibits to UCP's Motion to Dismiss, Ex. E, F.) That motion was granted in November 2012, and Grant filed an amended complaint in the S.D.N.Y. action on December 5, 2012. That amended complaint, however, did not make any allegations with regard to any of the conduct that took place in late 2011. (See id. Ex. C.)

It is "well-established" that "a plaintiff cannot avoid the effects of res judicata by 'splitting' his claim into various suits, based on different legal theories," Waldman v. Vill. of Kiryas Joel, 207 F.3d 105, 110 (2d Cir. 2000), but rather "must bring in one action all legal theories arising out of the same transaction or series of transactions," Am. Stock Exch., LLC v. Mopex, Inc., 215 F.R.D. 87, 91 (S.D.N.Y. 2002). "As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2000). If a final judgment in the earlier-filed case would bar litigation of the second case under the doctrine of claim preclusion, or res judicata, the second suit is duplicative and may be dismissed. See id. at 138-40 ("'[T]he true test of the sufficiency of a plea of "other suit pending" in another forum [i]s the legal efficacy of the first suit, when finally disposed of, as "the thing adjudged," regarding the matters at issue in the second suit.'" (quoting United States v. The Haytian Republic, 154 U.S. 118, 124 (1894))).

To establish res judicata, "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000). Under the third prong of that test, if claims arise subsequent to a prior action, they "need not, and often perhaps could not, have been brought in that prior action; accordingly, they are not barred by res

8

judicata regardless of whether they are premised on facts representing a continuance of the same course of conduct." Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 383 (2d Cir. 2003) (internal quotation marks omitted); see also Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 228 (1955) (A prior judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."); Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 919 (2d Cir. 2010) ("Claim preclusion does not bar claims, even between identical parties, that arise after the commencement of the prior action."); Legnani v. Alitalia Linee Aeree Italiane, S.p.A., 400 F.3d 139, 141 (2d Cir. 2005) ("[A]s a matter of logic, when the second action concerns a transaction occurring after the commencement of the prior litigation, claim preclusion generally does not come into play." (internal quotation marks omitted)). "Where the facts that have accumulated after the first action are enough on their own to sustain the second action, the new facts clearly constitute a new 'claim,' and the second action is not barred by res judicata." Storey, 347 F.3d at 384. "The crucial date" for this analysis "is the date the complaint was filed." Curtis, 226 F.3d at 139.

Even were Grant I to result in a final judgment, Grant's claims against UCP in this case would not be barred by res judicata. The original complaint in Grant I was filed in January 2011; the earliest of UCP's actions complained of in this suit occurred in October 2011, when Grant was suspended during the course of the investigation into the client abuse charge. Grant's allegations that UCP breached the CBA and unlawfully retaliated against her by transferring her in autumn 2011 give rise to new claims premised entirely on conduct that took place after the Grant I complaint was filed in January 2011. Because res judicata cannot bar claims that arise entirely after the commencement of the first suit, Grant has not improperly split her claims.

UCP argues that Grant's suit is nevertheless barred by the doctrine of claim splitting because, in January 2012, she indicated her intent to amend the Grant I complaint to add allegations regarding her October 2011 suspension and transfer from the Landings site. Had Grant in fact filed an amended complaint alleging those facts in January 2012 – before the complaint in this case was filed – UCP might have a valid argument. Grant did not, however, amend her complaint at that time and had no obligation to do so, see Curtis, 226 F.3d at 139 ("The plaintiff has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events . . . ."). At the time she brought this suit, the operative complaint in Grant I had been filed well before the October 2011 conduct complained of in this case; as such, she was entitled to "simply bring a later suit on those later-arising claims," id.

Finally, the Court rejects UCP's assertion that, even though the events in question arose after the filing of the complaint in Grant I, the rule against claim splitting applies because the new incidents are "merely . . . additional examples of the earlier-complained of conduct" (UCP Mem. at 9). In making this argument, UCP cites Cameron v. Church, 253 F. Supp. 2d 611, 620 (S.D.N.Y. 2003), which held that "[w]here material factual allegations overlap" between an earlier and later case, "'the facts essential to the barred second suit need not be the same as the facts that were necessary to the first suit [for claim splitting to bar the second suit]. It is instead enough that the facts essential to the second were [already] present in the first.'" Id. (quoting Waldman, 207 F.3d at 110-11) (emphasis in original) (other internal quotation marks omitted). The Cameron court found that a second suit was barred by res judicata because the plaintiff's second complaint alleged nothing more than "different legal theories" and different motivations for the same conduct that had already been complained of in the first suit, as well as a few new facts postdating the dismissal of the first case. Id. at 620-23. Unlike in Cameron, Grant, in this

10

case, is not alleging new facts that simply change her legal theory or offering allegations of new conduct that substantially overlaps with the conduct alleged in that earlier case. Rather, Grant's claims here require no reference to or knowledge of the incidents alleged in Grant I, but are their own independent legal claims based on entirely distinct facts. In such instances, it was not improper for Grant to bring those claims in a new action. Compare Waldman, 207 F.3d at 113 (finding that res judicata applies because "it is simply not plausible to characterize Waldman's claim as one based in any significant way upon" new facts).

## II.    The Hybrid § 301/Duty of Fair Representation Claim

### A.  General Principles

Although an individual employee may bring suit against his employer for breach of a collective bargaining agreement, he first must "attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement." DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 163 (1983). However, because "this rule works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure . . . breach[es] its duty of fair representation," in such instances "an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." Id. at 164. Such a claim is called a "hybrid § 301/DFR claim," and requires a plaintiff to "prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members." White v. White Rose Food, 237 F.3d 174, 178 (2d Cir. 2001) ("White II"); see DelCostello, 462 U.S. at 164. "[T]he two claims are inextricably interdependent," id. (internal quotation marks omitted); although the plaintiff can chose to sue either the union, the employer, or both, he must, in any event, "allege violations on the part of both," White II, 237

11

F.3d at 179; see also DelCostello, 462 U.S. at 165 ("[T]he case [plaintiff] must prove is the same whether he sues one, the other, or both."). "In order to prevail" on a hybrid suit, "a plaintiff must succeed in both of his claims." Arteaga v. Bevona, 21 F. Supp. 2d 198, 204 (E.D.N.Y. 1998).

In order to establish a breach of a union's duty of fair representation, a plaintiff must establish two elements: (1) "that the union's actions or inactions are either arbitrary, discriminatory, or in bad faith"; and (2) that there is "a causal connection between the union's wrongful conduct and [plaintiff's] injuries." Vaughn v. Air Line Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010) (internal quotation marks omitted). "'[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, as to be irrational.'" White II, 237 F.3d at 179 (quoting Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991)) (other internal quotation marks omitted). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 45-46 (1998); see also Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998) ("Judicial review of union action . . . must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." (internal quotation marks omitted)). Arbitrary conduct "is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." NLRB v. Local 282, Int'l Bhd. of Teamsters, 740 F.2d 141, 147 (2d Cir. 1984) (internal quotation marks omitted). "[M]ere negligence, even in the enforcement of a collective-

bargaining agreement" does not establish a breach of the duty of fair representation. United Steelworkers of Am. v. Rawson, 495 U.S. 362, 372-73 (1990).

To establish a duty of fair representation claim based on bad faith, a plaintiff must show that the union acted "with an improper intent, purpose, or motive." Spellacy, 156 F.3d at 126; see also White II, 237 F.3d at 179 ("A showing of [b]ad faith requires a showing of fraudulent, deceitful, or dishonest action." (internal quotation marks omitted)). "A union's acts are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'" Vaughn, 604 F.3d at 709 (quoting Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge, 403 U.S. 274, 301 (1971)).

### B. The 2009 and 2010 Grievances

The Court first addresses Grant's claim that UFT breached its duty of fair representation by failing to require Seiler to put his reasons for denying her 2009 and 2010 grievances in writing at Step Two of the grievance process.[2] Article 29(C)(1) of the CBA requires that the UCP designee at Step Two put his answer to a grievance in writing and "set forth the reason if the grievance is denied." (CBA Art. 29(C)(1).) Grant alleges that UFT's failure to enforce this provision of the CBA harmed her by allowing UCP to act with little accountability, making it "very easy for Mr. Seiler to deny grievances for no legitimate reason," and by inhibiting UFT from being able to fairly and properly evaluate whether to take denied grievances to arbitration. (SAC ¶¶ 23-24.) In its motion to dismiss, UFT argues that this claim is both untimely and fails to state a plausible claim.

A hybrid § 301/DFR claim is subject to a six-month statute of limitations. DelCostello, 462 U.S. at 172. This period "begins to run when the employee knew or should have known of

---

[2] Grant does not assert any claim against UCP related to the denial of the 2009 and 2010 grievances.

the breach of the duty of fair representation." <u>White v. White Rose Food, a Div. of DiGiorgio Corp.</u>, 128 F.3d 110, 114 (2d Cir. 1997). UFT argues that because Grant knew by August 2011 at the latest that UFT would not take the denial of her 2009 and 2010 grievances to arbitration, her claim based on those grievances is time-barred.

UFT's timeliness arguments are unpersuasive. Grant does not claim that UFT breached its duty of fair representation by declining to take her claims to arbitration; rather, she faults UFT for failing to require Seiler to put his reasons for denying grievances at Step Two in writing. The relevant question, therefore, is when Grant knew or should have known that UFT was not enforcing the provision requiring the reasons to be put in writing. As the CBA does not require Seiler to provide the grievant with the written response – instead, only the union must be provided with the written reasons (<u>see</u> CBA Art. 29(C)(1)) – there is no basis for concluding that Grant become aware that no written statement was provided at the time she was informed UFT would not take her claims to arbitration. Rather, the complaint alleges that Grant did not become aware of UFT's alleged failure to enforce that provision until Seiler's deposition in this action on May 30, 2012. (SAC ¶ 22.) Grant first asserted a claim based on that conduct in her July 2012 first amended complaint. (<u>See</u> DE 4 ¶ 20.) The claims are therefore timely.

Nonetheless, the Court finds that Grant's allegations based on the 2009 and 2010 grievances fail to state a plausible claim for relief. Grant's allegations that UFT's conduct enabled UCP to act with little accountability and inhibited the union from being able to properly evaluate whether to take grievances to arbitration are nothing but conclusory allegations devoid of a factual basis in the record. Grant alleges no facts suggesting that her grievances would have been upheld but for the failure to provide reasons in writing, or that UFT would have decided to take her grievances to arbitration had written reasons for the denial been provided. Furthermore,

even if Grant could show that she was harmed by UFT's failure to enforce that particular provision of the CBA, there is no suggestion that the failure was arbitrary, discriminatory, or in bad faith. Grant does not allege that UFT was motivated by an improper purpose toward its members in failing to require written reasons for the denial of grievances, nor does she allege that the requirement was ignored only with regard to her grievances (to the contrary, the complaint alleges that Seiler "never put his reasons in writing" (SAC ¶ 22 (emphasis added))). Although a union's conduct in failing to enforce a collective bargaining agreement can be a breach of its obligations under the duty of fair representation, UFT's alleged conduct rises to, at most, mere negligence, as there is no indication that the failure to enforce that particular provision of the CBA had any significant impact on the rights of UFT's members. As such, the Court dismisses Grant's claims against UFT based on the 2009 and 2010 grievances.

### C. The 2011 CBA Breaches and Grievance

The thrust of Grant's complaint is a hybrid § 301/DFR claim brought against both UFT and UCP. Grant claims that UFT violated it duty of fair representation to Grant through its actions in the aftermath of her transfer from the Landings site, and that UCP breached the CBA by transferring her, reducing her work hours, and then attempting to transfer her again. Defendants argue that Grant has failed to state either a duty of fair representation claim or a § 301 claim for breach of the CBA. Additionally, UFT argues that Grant's claims must be dismissed for failure to exhaust administrative remedies.

### 1. *Exhaustion*

UFT argues that, because Grant did not allege that she pursued her December 2011 grievance to Step Two of the grievance process, her claim must be dismissed for failure to fully exhaust the CBA's grievance and arbitration procedures. Although an "employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement" prior to bringing a federal lawsuit, Vaca v. Sipes, 386 U.S. 171, 184 (1967), such exhaustion is not required when the union breached its duty of fair representation with respect to the grievance or arbitration procedure, see DelCostello, 462 U.S. at 163-64. Indeed, the very purpose of the hybrid § 301/DFR claim is to allow an employee to enforce her rights under a collective bargaining agreement when the union has failed to adequately fulfill its duty to the employee. As Grant alleges both that UCP violated the CBA, and that UFT breached its duty of fair representation with regard to Grant's attempts to pursue a grievance, she was not required to plead exhaustion.[3]

### 2. *Breach of the Duty of Fair Representation*

Grant alleges that, in late 2011 and early 2012, UFT breached its duty of fair representation in five ways: (1) by failing to file a grievance regarding her transfer until over a month after UFT was aware of the issue; (2) by "overtly siding with UCP" and failing to represent Grant's interests at the November 16, 2011 meeting; (3) by failing to act expeditiously in prosecuting the grievance after it was filed; (4) by again siding with UCP and failing to

---

[3] To the extent that UFT argues that Grant was required to at least "attempt" to use the CBA's grievance procedures, the Court concludes that she has adequately plead facts suggesting such an attempt. The complaint clearly alleges that Grant asked UFT to initiate grievance proceedings on her behalf (which the union eventually did). Although, as UFT argues, she does not allege that she then sought review of the Step One denial of her grievance through a Step Two proceeding, she was not required to do: Under the terms of the CBA, only UFT could appeal to a Step Two proceeding. (See CBA Art. 29(C)(1) ("If the grievance is not resolved at Step One, the Union may appeal in writing . . . .").) As such, Grant's initial request that UFT pursue a grievance was a sufficient "attempt to use the official procedures" under the CBA, Clarke v. Commc'ns Workers of Am., 318 F. Supp. 2d 48, 55 (E.D.N.Y. 2004) (internal quotation marks omitted).

represent her interests at the April 2012 Step One meeting; and (5) by requiring Grant to sign an agreement releasing UFT from liability in order for her to be able to return to work. (SAC ¶ 27.) Assuming the truth of these allegations, this Court concludes that the conduct alleged supports a reasonable inference that UFT acted arbitrarily and in bad faith in its representation of Grant.

Much of UFT's alleged conduct, standing alone, would not establish a breach of the duty of fair representation. For example, the claim that a union "was not aggressive enough, [and] not fast enough" in pursuing a grievance does not necessarily establish a breach of the duty of fair representation. Mazza v. Dist. Council of N.Y., Nos. CV-00-6854, CV-01-6002, 2007 WL 2668116, at *12 (E.D.N.Y. Sept. 6, 2007). Without other facts suggesting that the union was deliberately hostile to Grant or was acting with the intent that her claim fail, the fact that UFT delayed in bringing the grievance and was thereafter slow in processing it does not demonstrate the requisite improper motive or lack of rational basis necessary to state a claim for relief.[4] Similarly, although perhaps relevant as evidence of an improper motive on the part of UFT, the Court declines to find, in the absence of authority suggested by any party to the contrary, that a union can breach its duty of fair representation simply by requiring an employee to sign a liability release in conjunction with the resolution of an employee's grievance.

Nonetheless, Grant's allegations regarding UFT's conduct during the meetings held to address her concerns, when considered in conjunction with the other allegations of the complaint, paint a picture of a union doing the bare minimum to vindicate Grant's rights and less than interested in representing her in any meaningful sense, see Samuels v. Air Transp. Local 504, 992 F.2d 12, 16 (2d Cir. 1993) ("When a union ignores or perfunctorily presses a

---

[4] The Court also notes that, as Grant does not argue the delay in filing the grievance caused it to be waived, there is no indication that she was prejudiced by that delay, see Smith v. Drug, Chem., Cosmetics, Plastics & Affiliated Indus. Warehouse Emps. Local 815, 943 F. Supp. 224, 239 (E.D.N.Y. 1996) (finding union's delay in filing grievance was not a breach of its duty of fair representation in part because the employer never argued that the delay had waived the right to grieve the termination).

meritorious claim, it is held to have acted arbitrarily."). Grant clearly and specifically alleges facts demonstrating UFT's hostility toward Grant during the initial November 16 meeting: She alleges that Wint – UFT's primary representative at the meeting – "overtly sided with and defended UCP," by, inter alia, "angrily" telling Grant that she had to either accept a second transfer to one of two locations that would have caused Grant hardship "or stay home without pay," failing to "question or challenge" UCP as to why Grant was being transferred again, and failing to ask for support for either UCP's allegations that the consumers at the E. 51st Street site had made complaints about Grant or for UCP's claims that no other transfer sites were available. (SAC ¶ 16.) Similarly, Grant alleges that at the April 2012 Step One meeting, convened as part of the formal grievance process, UFT failed to "discuss the substance of the purported grievance" or "actually prosecute[]" the grievance, did not advocate for her reinstatement to her original position at the Landings site, and precluded her from returning to work when she refused to release UFT from liability with regard to its representation of her. (Id. ¶ 21.) The facts alleged support Grant's contention that UFT was not, in fact, acting as her representative and trying to resolve her grievance at these meetings, but rather was supporting UCP's continuing attempts to violate the CBA.[5] "[F]acts implying that Union officials were hostile towards [the] plaintiff," Herr v. Cineplex Odeon Corp., No. 92 CIV. 5447, 1994 WL 75008, at *5 (S.D.N.Y. Mar. 4, 1994), or allegations that a union cooperated with an employer in order to disadvantage an employee, see Wilson v. Am. Postal Workers Union, No. 11 Civ. 3097, 2012 WL 3822565, at *4 (S.D.N.Y. Sept. 4, 2012) (finding complaint stated a duty of fair representation claim based

---

[5] Grant's allegations regarding Boucicault's involvement at the November 16 meeting do not, as UFT argues, undermine this conclusion. Although Boucicault's actions may add some merit to UFT's factual argument that Grant was well-represented at the meeting, the complaint clearly alleges that it was Wint who "took over" Grant's representation at the meeting. (SAC ¶ 16.) The allegation that Boucicault asked a single question during the meeting does not suffice to contradict the allegations supporting this characterization. As such, Grant's allegations regarding Wint's conduct are certainly sufficient to suggest that UFT failed to adequately represent her at that meeting.

18

on union's alleged cooperation with employer to prevent plaintiff's promotion), are sufficient to state a claim that a union breached its duty of fair representation. Considered in light of the additional allegations regarding UFT's short delay in initially filing the grievance and several-month delay before holding the Step One meeting, despite Grant being at home without pay during that time (SAC ¶ 20), the Court has no difficulty in holding that Grant has sufficiently alleged that UFT's actions were arbitrary and in bad faith.

Grant's complaint also adequately pleads a causal connection between UFT's alleged arbitrary and bad faith conduct and Grant's injuries. It is certainly plausible that, had UFT's representatives at those meetings more forcefully advocated for Grant's reinstatement to the Landings site, or for her to be transferred to a more suitable alternative site, she would have received some sort of relief for her lost wages and reduction in hours, and she would not have been forced to stay home without pay during the pendency of her grievance. Grant, therefore, has sufficiently stated a breach of the duty of fair representation claim against UFT.

### 3. *Breach of the CBA*

Grant has also adequately alleged that UCP breached the CBA. The complaint alleges that UCP breached the following provisions of the CBA: (1) Article 27(D), which provides that employees shall not be transferred arbitrarily or capriciously, that involuntary transfers shall start with the least senior qualified employee, and that involuntarily-transferred employees shall be informed of the reason for the transfer and provided with advance notice; (2) Article 25(A)(1), which provides that an employee's hours shall not be reduced except for lack of work, in which case hours shall be reduced starting with the least senior employees; and (3) Article 28(B), which gives UCP the right to discharge, suspend, or discipline any employee for just cause. (SAC ¶¶ 30-39.) Grant's factual allegations support each of these alleged breaches. She alleges (1)

19

that she was transferred from the Landings site to the E. 51st Street site without cause and ahead of less senior employees (id. ¶ 13), (2) that her hours were reduced due to the transfer, despite the fact that there was no lack of work and that less senior employees did not have their hours reduced (id.), and (3) that there was no basis, disciplinary or otherwise, for either the transfer to the E. 51st Street site or for UCP's subsequent attempt to transfer her to another site (id. ¶¶ 11-13, 16-18). These allegations are sufficient to state a claim that UCP breached each of the three CBA provisions at issue.

UCP nonetheless argues that, because the charges of client abuse against Grant were determined to be "unfounded," the transfer of Grant from the Landings site was permissible under the terms of the CBA. (UCP Mem. at 16-17.) Appendix B of the CBA provides for three possible resolutions to a charge of client abuse: a finding (1) that the charges are "substantiated," in which case the employee is to be terminated; (2) that the charges are "false," in which case the employee is to be reinstated with back pay; and (3) that the results of an investigation are "inconclusive," in which case the employee is to be reinstated with back pay, but may, "[i]n some cases . . . be transferred to another program." (CBA App. B.) According to UCP, the finding that the allegations against Grant were "unfounded" is equivalent to an "inconclusive" finding, thus allowing UCP to transfer her. (UCP Mem. at 17.)

The Court does not read "unfounded" to mean "inconclusive." "Unfounded" means "lacking a sound basis in reason or fact," Webster's Third New International Dictionary 2496 (1969); a definitive word conveying at its essence that the proposition in question is unsupportable. "Inconclusive," by contrast, means "leading to no conclusion or to no definite result," conveying complete uncertainty as to the truthfulness of a proposition, id. at 1144. A determination that the allegations against Grant were "unfounded" is thus essentially one that

20

they were false, or at the very least that they far more likely to be false than true. Furthermore, even were this Court to agree with UCP's interpretation of the result of the investigation, a finding of "inconclusive" would only allow for the transfer of Grant, not other adverse action. Such a finding would not justify Grant's resulting loss in hours, or the subsequent attempt to again transfer her, either of which in and of itself would constitute a breach of the CBA.

Having determined that Grant's complaint adequately alleges both a breach of the duty of fair representation on the part of UFT and a breach of the CBA by UCP, the Court denies the defendants' motions to dismiss the hybrid § 301/DFR claims.

## III. State Law Claims

Grant also asserts claims of retaliation under the NYSHRL and NYCHRL against both UFT and UCP. To state a claim of retaliation under either statute, a plaintiff must demonstrate that "(1) she has engaged in protected activity, (2) her employer was aware that she participated in such activity, (3) she suffered an adverse employment action based upon her activity, and (4) there is a causal connection between the protected activity and the adverse action."[6] Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 313 (2004).

### A. UFT's Motion to Dismiss the State Law Claims

UFT argues that Grant's state law claims are "subsumed" by the federal statutory duty of fair representation, and they therefore must be dismissed as against UFT. (UFT Mem. at 26-27.) Generally, when a state regulates an activity that is protected by the NLRA or which constitutes an unfair labor practice under the NLRA, "due regard for the federal enactment requires that state jurisdiction must yield." San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 244 (1959). Although the Second Circuit has not addressed the issue, district courts in this Circuit

---

[6] The Court is mindful that the class of retaliatory actions cognizable under the NYCHRL is broader than the adverse actions cognizable under the NYSHRL and Title VII. Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 66-71 (N.Y. 1st Dep't 2009). Whether Grant suffered an adverse employment action, however, is not contested.

have regularly held that "[s]tate law claims alleging conduct that is within the union's duty of fair representation are subsumed by this duty and are therefore preempted." Zuckerman v. Volume Servs. Am., Inc., 304 F. Supp. 2d 365, 373 (E.D.N.Y. 2004). "Put differently, where a state law claim gives no new rights to the employee and imposes no new duty on the union, it is preempted." Id.

In this case, Grant alleges that UFT violated the NYSHRL and NYCHRL by refusing to diligently pursue her grievance and by supporting UCP's actions against her in retaliation for her filing of the Grant I discrimination lawsuit against UCP. Such conduct, however, would also constitute a violation of UFT's duty of fair representation towards Grant, as that duty "unquestionably forbids a union from discriminating against its members in its representative capacity," Rodolico v. Unisys Corp., 96 F. Supp. 2d 184, 188 (E.D.N.Y. 2000). Because Grant's claim seeks to vindicate the same rights as those protected by the duty of fair representation, her NYSHRL and NYCHRL claims are preempted. Accord Holcombe v. US Airways Grp., Inc., Nos. 03-cv-4785, 08-cv-1593, 2013 WL 5525686, at *9 (E.D.N.Y. Sept. 30, 2013); Angrisani v. Long Island R.R., No. CV-01-8453, 2005 WL 1311798, at *6-*7 (E.D.N.Y. June 1, 2005); Zuckerman, 304 F. Supp. 2d at 373; Rodolico, 96 F. Supp. 2d at 187-89; Fenn v. Verizon Commc'ns, Inc., No. 08 Civ. 2348, 2010 WL 908918, at *6 (S.D.N.Y. Mar. 15, 2010); Cabrera v. NYC, 436 F. Supp. 2d 635, 646 (S.D.N.Y. 2006); Marrero v. City of NY, No. 02 Civ. 6634, 2003 WL 1621921, at *3 (S.D.N.Y. Mar. 28, 2003); Agosto v. Corr. Officers Benevolent Ass'n, 107 F. Supp. 2d 294, 310-11 (S.D.N.Y. 2000); Snay v. U.S. Postal Serv., 31 F. Supp. 2d 92, 99-100 (N.D.N.Y. 1998). Accordingly, Grant's state law claims against UFT must be dismissed.

## B. UCP's Motion to Dismiss the State Law Claims

UCP argues that Grant's NYSHRL and NYCHRL claims against it should be dismissed because Grant has failed to allege facts supporting a claim of retaliation under those statutes; namely, because the facts of Grant's complaint fail to give rise to an inference of a causal connection between Grant's January 2011 filing of the complaint in Grant I and her suspension and transfer in October 2011. UCP argues that because Grant's protected activity occurred nine months prior to those adverse actions, she has failed to demonstrate any causal connection.

For purposes of a retaliation claim under either the NYSHRL or NYCHRL,[7] a causal connection "can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000). In this case, because Grant alleges no direct evidence of retaliatory animus on the part of UCP, she relies solely on indirect evidence: the alleged temporal proximity between her protected conduct and the adverse actions, and the disparate treatment between herself and the two other employees against whom client abuse allegations were made.

The Court concludes that Grant's allegations sufficiently raise the inference of a causal connection between the filing of Grant's complaint and the adverse actions such that her NYSHRL and NYCHRL claims can survive a motion to dismiss. Although the nine-month gap between the filing of Grant's lawsuit and the alleged retaliatory conduct might be insufficient, on its own, to state a retaliation claim, see Ghaly v. U.S. Dep't of Agric., 739 F. Supp. 2d 185, 200

---

[7] The standards for demonstrating causation under either the NYSHRL or NYCHRL are the same as under Title VII. See Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

(E.D.N.Y. 2010) (noting that three months is "the outer edge" for an inference of causation (internal quotation marks omitted)), the totality of the circumstances alleged are sufficient to raise an inference of a causal connection. Critically, Grant does not rely solely on temporal proximity to establish a causal connection; she also alleges facts suggesting that she was treated differently than similarly situated employees. She alleges that of the three employees subject to the October 2011 client abuse allegations, only she was suspended pending the outcome of the investigation, and only she was ultimately transferred to a new location and forced to sustain a reduction in hours and wages. (SAC ¶¶ 10-11.) Because "one way to establish a claim of retaliation is to show that the complaining employee is treated differently than other employees who did not engage in a protected activity," Conklin v. County of Suffolk, 859 F. Supp. 2d 415, 433 (E.D.N.Y. 2012), such allegations raise the inference of a causal connection between the protected activity and the adverse action. Those allegations, particularly when considered alongside allegations that Grant had been actively prosecuting her Grant I lawsuit very shortly prior to her suspension and transfer (see SAC ¶ 12 (alleging Grant's suspension was less than a month following the initial conference in Grant I)), render her retaliation claims against UCP sufficient to survive a motion to dismiss, cf. Infantolino v. Joint Indus. Bd. of Elec. Indus., 582 F. Supp. 2d 351, 359 (E.D.N.Y. 2008) (noting that, under the ADA, protected activity includes not only the filing but also the prosecution of a retaliation lawsuit).

## CONCLUSION

For the reasons above, the Court grants the defendants' motions to dismiss to the extent of dismissing (1) Grant's claim that UFT breached its duty of fair representation with regard to the 2009 and 2010 grievances, and (2) Grant's claims against UFT brought under the NYSHRL and NYCHRL. The motions to dismiss are denied with respect to Grant's hybrid § 301/DFR

24

claims against both UFT and UCP based on her transfer from the Landings site and the related conduct that occurred in late 2011 and early 2012, and with respect to her NYSHRL and NYCHRL claims against UCP.

        SO ORDERED.

Dated: Brooklyn, N.Y.
      March **11** , 2014

                           s/Carol Bagley Amon

                           Carol Bagley Amon
                           Chief United States District Judge